BENJAMIN F. DUDDERAR, Executor of the Will of Peter Dudderar, Deceased, vs. WARREN E. DUDDERAR and DAISY DUDDERAR.

*Wills: undue influence. Knowledge and capacity of testator. Evidence; conversations; statements of executors; previous wills prepared by testator; declaration of testator. Witnesses: evidence in chief stricken out; ruling reversed after departure of witness; right to recall for cross-examination.*

Upon issues being sent to a Circuit Court, involving the testator's knowledge of the contents of the will, undue influence, or testamentary capacity, it is admissible to introduce evidence of an unexecuted testamentary paper prepared by the testator with his own hand sometime before the execution of the last testament, in order to show that the will in controversy was not in accord with his previous intention.

p. 610

The fact that the paper was not formally executed affects its weight, but not its admissibility. p. 610

When a witness is asked to state what was said to him by the other party to a conversation under inquiry, his testimony should not be held to be irresponsive, merely because it included questions asked by the witness himself, which elicited the declaration sought to be proved. 609

The declaration made by a testator some months after the execution of the will, expressing dissatisfaction at its provisions, and stating that he had been persuaded to make it, are admissible for the purpose of showing mental capacity at the time of making the will, provided the declarations are not too remote to be considered part of the *res gestæ.*

p. 609

The Court had ruled that the evidence given by a witness was incompetent, and a motion to strike it out was granted; the witness left the stand and returned home; on the day following the Court reversed its ruling and held that the evidence was admissible; *it was held* that the Court had the right to reverse its ruling if it reached the conclusion that the evidence was proper; if the exceptant thought the witness should be cross-examined he should have had him recalled.    p. 611

Where, upon a caveat, issues are being tried as to undue influence, it is permissible to show that the executor had stated at the time of receiving his letters, that he wanted all the commissions he could get, as he would probably have trouble.

p. 612

The mere fact that the caveatee persuaded the testator, his father, to make an abatement in his will of certain proposed shares for the caveators, does not of itself constitute undue influence.                    p. 619

Upon the trial of issues to determine the question of undue influence, a prayer which seeks to instruct the jury that the "influence which will avoid a last will and testament must be exerted to such a degree as will amount to force or coercion destroying free agency. It must not be the influence of affection or attachment, nor the mere desire of gratifying the wishes of another, * * * and there must be some satisfactory proof that the instrument offered in evidence as the last will and testament of (the testator) was obtained by the character of coercion above mentioned or by importunities which could not be resisted, so that the motive for executing the will amounted to force or fear."—is correct.                    p. 614

Where, from the testimony, it appears that the only influence used by the caveatee was to convince the testator that, in the

will he had prepared, he had discriminated against several sons and daughters in favor of two other sons, and where the caveatee had not thereby procured, or sought to procure, for himself any advantage over his other brothers and sisters, *it was held* that it was not an exercise of undue influence, and that the final act of the testator was in the exercise of his own judgment and volition.          p. 620

*Decided November 22nd, 1911.*

Appeal from the Circuit Court of Washington County (KEEDY, J.).

The cause was argued before BOYD, C. J., PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Frank C. Norwood* and *Aubrey Pearre, Jr.,* for the appellant.

*Leo Weinberg* (with whom were *Frank L. Stoner* and *Charles D. Wagaman* on the brief), for the appellee.

URNER, J., delivered the opinion of the Court.

The questions to be determined in this case have been raised upon exceptions to rulings of the Court below in the course of the trial of issues which originated in the Orphans' Court of Frederick County upon a caveat, after probate, to the will of Peter Dudderar, deceased. There were three of these issues and they involved the inquiries; whether the testator had knowledge of the contents of the will, whether it was procured from him by undue influence, and whether he had the requisite testamentary capacity at the time of its execution. The issues were transmitted in the first instance to the Circuit Court for Frederick County and were thence removed to the Circuit Court for Washington County where the trial occurred which has resulted in this appeal. There are five bills of exceptions relating to the admission of evidence and one which is concerned with the disposition of the prayers.

The will was executed on July 2nd, 1910, and the testator died on the last day of the same month. He had been a widower for a number of years. His estate amounted to about six thousand dollars. In 1910 he had sold two farms which he then owned to two of his sons and had divided the proceeds equally among his nine children. He was eighty-four years of age when he executed the will. It first provided for the conversion of the estate into money and for the payment of debts and funeral expenses. It next bequeathed to the testator's daughter Emma, in consideration of services she had rendered him, the sum of two hundred dollars, and to his grandson, William Westwood Dudderar, his watch and chain. A provision then followed that the remainder of the estate should be divided into nine equal shares, one of which should be given to each of the testator's eight living children and one to the children of a deceased daughter, "with the exception" that the shares of his sons, Warren E. and Daisy A. Dudderar, should be reduced $500 and $250, respectively, by reason of extra amounts given them in the sale of the farms they had purchased from their father. The appellee, who is the oldest son of the testator, was named in the will as its executor. The caveat was filed by the two sons whose shares were reduced.

The first exception was taken to the refusal of the Court to strike out part of the answer of Westwood Dudderar, a son of the testator, who, in answer to an inquiry as to whether he had talked to his father about the will after the date of its execution, testified: "I asked my father for the two old wills that he had started, and he said I could have them, told me to go to the desk and get them and read the one that was finished except the signing, as well as I can remember, then I asked him whether he had an intention to take this five hundred dollars off of Bud and two hundred and fifty dollars off of Daisy before the evening of the second and he said he had not." It is objected that the last sentence of the answer was not responsive to the interrogatory and that it is inadmissible as a declaration of the testator made after

the execution of the will.  This objection was properly over-ruled.  When a witness is asked to state what was said to him by the other party to the conversation under inquiry it could not be held that his testimony was irresponsive merely because it included a question asked by the witness him-self which elicited the declaration sought to be proved. While the interrogatory was directed to what the *testator* said on the occasion mentioned, the answer of the witness in the present instance, would have been unintelligible if it had eliminated the inquiry to which the former replied.  Upon the general question as to the admissibility of the declara-tion thus sought to be excluded we are relieved of any dif-ficulty by the decision of this Court in *Griffith* v. *Diffender-fer,* 50 Md. 466.  It was there held that declarations made by a testatrix some months after the execution of her will expressing her dissatisfaction with its provisions and stating that she had been persuaded to make it were admissible for the purpose of proving her mental condition at the time of making the disposition in question.  "It is a common prac-tice," said the Court, "to admit such testimony under issues involving testamentary capacity, and upon the same ground it ought to be received under issues of fraud and undue influence; provided they are made sufficiently near in time as to justify a reasonable inference that the mental condi-tion which they are intended to denote, existed at the time of the execution of the will."  This rule is subject to the qualification that "where such declarations are made so remote as not to constitute part of the *res gestae,* they are not competent to prove the facts upon which the charge of undue influence is founded."

The second exception relates to the admission in evidence of the draft of an unexecuted will written by the testator sometime in the year 1909.  This differed in some import-ant particulars from the will actually executed in 1910.  It provided for a sale of the estate and a division of the pro-ceeds among the testator's children who *might be living at the time of his death.*  It contained no exceptions with refer-

ence to the shares of the two sons who had purchased the farms, but left them upon an equal footing with the other surviving children. There was a direction to the executor to pay the testator's daughter Emma seventy-five cents per week from January 1, 1900, to the time of his death, and there was a bequest to the same daughter of a set of bed-room furniture and a sewing machine. In other respects the paper offered in evidence contained the same provisions as the will. The object of the offer was, of course, to show that the will in controversy was not in accord with the testator's antecedent intentions, especially with reference to the dispositions in favor of the two sons whose shares were diminished. It is urged in opposition to the admission of this evidence that the testimony already in the case showed that the testator had previously referred to the paper as an incomplete will which did not express his wishes. We have been unable to find in the record any support for this contention. There is testimony to the effect that upon the occasion of the execution of the will on July 2, 1910, the testator pointed to his desk from which the paper in question was later obtained and said he had started "his business" twice and that it had never been finished. This does not amount to a statement that the paper which he had himself written a year before and which was unfinished only with respect to its execution did not represent his views at the time of its preparation. The fact that it was not formally executed might affect the *weight* of the evidence, but its *admissibility* can not be open to serious doubt. In *Griffith* v. *Diffenderfer, supra,* it was ruled that evidence of a testator's declaration in regard to his testamentary intentions, made a number of months before the execution of the will in dispute and before any improper influences are supposed to have been exerted, are admissible for the purpose of showing that the will is "consistent with the long cherished wishes of the testator; or that it is contrary to well settled convictions of what he thought was a just and proper disposition of his property." The same rule was applied in *Moore* v. *McDon-*

*ald,* 68 Md. 338, and *Davis* v. *Calvert,* 5 G. & J. 269. The
evidence here objected to is clearly within the principle of
these decisions and there was no error in its admission.

It appears from the third bill of exceptions that William
H. Pearre, chief judge of the Orphans' Court of Frederick
County, testified to the effect that Benjamin F. Dudderar,
the executor named in the will, stated at the time he received
his letters testamentary that he wanted all the commissions
he could get because he expected to have trouble. This tes-
timony was admitted subject to exception and a motion to
strike it out was granted. Subsequently the Court changed
its ruling and held that the evidence was competent. The
exception recites that this later action occurred at the close
of the plaintiff's case on the day following the examination
of JUDGE PEARRE and after he had returned to his home in
Frederick county. It states further that upon the granting
of the motion to strike out the testimony claimed to be
objectionable the witness was allowed to leave the stand
without cross-examination. The final ruling embraced in
this exception is questioned on the ground that the evidence
is inadmissible and that the defendant was deprived under
the circumstances of an opportunity to cross-examine the wit-
ness as to the statement referred to in his testimony. As
to the latter objection it is sufficient to observe that there
is no ruling of the Court below to which it can be applied.
There was no refusal to permit the witness to be recalled
for cross-examination or to hold the case open in order that
his attendance might be procured for that purpose. The
exception, according to its own language, was taken to the
"action of the Court in overruling the said motion to strike
out the said testimony and also changing its ruling" at the
time and in the manner described. If the motion should
not have been granted in the first instance, it was entirely
proper that the Court should reverse its action during the
subsequent course of the trial upon reaching the conclusion
that the evidence was competent. If the defendant thought
a cross-examination desirable, he should have asked that the

witness be recalled. It is not to be assumed that such an application would have been refused, but as the exception does not suggest that it was made at all, there is no ruling upon this point to be reviewed. We think the Court was right in rescinding its order sustaining the motion to strike out the testimony involved in this exception. While the statement that the caveatee, in discussing the question of his commissions as executor, that he expected to have trouble, would seem to have in itself very little probative value, it was properly admitted in view of the nature of the inquiry presented upon the issue of undue influence. *Moore* v. *McDonald* and *Davis* v. *Calvert, supra.*

The fourth exception refers to the admission of proof to show that after the preparation of the unexecuted will in 1909 the testator did not pay his daughter Emma anything on account of her services. In reply to an inquiry by the Court it was stated that the object of this testimony was to show that while the obligation which the testator at that time indicated that he felt towards his daughter had not been diminished by payment, the provision made for her benefit in his will was reduced as compared with the disposition in the earlier paper, as tending to show that the testator's intention in this regard was different from that which he had previously entertained the evidence was admissible.

In answer to questions as to whether she ever heard anything showing that her brother Benjamin, the caveatee, had influence over her father, Miss Emma Dudderar testified: "I noticed when he would go down to my brother's he would always be so different towards me when he would come back. When I would talk to him sometimes he would not answer me, and before he would go down there he would be as nice as always. Sometimes this would last several days." Her father told her, she said, that her brother Benjamin would tell him that she was not treating him right. This evidence was admitted after objection by the defendant, and his motion to strike it out was overruled. The action

of the trial Court in this respect is the occasion for the fifth exception. The testimony thus challenged reflects to some extent upon the attitude of caveatee, against whom the charge of undue influence was preferred, towards one of the natural objects of the testator's bounty. It may also have had a tendency to illustrate the caveatee's influence with the testator. In either of these aspects the testimony was competent and the Court correctly ruled to that effect.

At the close of the evidence on both sides the Court at the instance of the defendant directed a verdict in his favor upon the issues relating to the testator's capacity and his knowledge of the contents of the will. A prayer proposing a similar instruction as to the issue of undue influence was refused. In the sixth bill of exceptions the defendant complains of the rejection of this prayer, which was his third, and of his fifth, sixth and seventh prayers, and the granting of the second prayer of the plaintiff. The last mentioned instruction submitted the issue of undue influence to the jury in the form approved in *Taylor* v. *Creswell,* 45 Md. 422. The defendant's fifth prayer was concerned with the issue relating to the testator's knowledge of the contents of the will, and as that issue was withdrawn from the jury the instruction would have been inappropriate. By his seventh prayer the defendant sought to have the jury instructed that to enable them to render a verdict for the plaintiffs it would be necessary to find that undue influence was "exercised on the testator at or about the time of the execution of" the will. A prayer in this form might confuse the jury upon the question as to whether or not it is necessary to find that the undue influence was actively exerted when the will was about to be executed. It is well settled that the controlling inquiry is not whether such influence is exercised, but whether it is *operative,* when the testamentary act is performed. The defendant's ninth prayer, which was conceded, adopted this theory, and required the jury to find, before they could invalidate the will, that at or about the

time of the execution of the instrument undue influence "dominated" the will of the testator. We think the seventh prayer was properly rejected.

The defendant's sixth prayer proposed to define undue influence. It sought to instruct the jury that the "influence which will avoid a last will and testament must be exerted to such a degree as will amount to force or coercion destroying free agency. It must not be the influence of affection or attachment, nor the mere desire of gratifying the wishes of another, for that would be a very strong ground in favor of the testamentary act, and there must be some satisfactory proof that the instrument offered in evidence as the last will and testament of Peter Dudderar was obtained by the character of coercion above mentioned or by importunities which could not be resisted, so that the motive for executing the will amounted to force or fear." This prayer is practically identical in terms with instructions approved in *Laymen* v. *Conrey*, 60 Md. 286, and *Higgins* v. *Carlton*, 28 Md. 115, and we have no alternative but to hold that there was error in its rejection. The case went to the jury without any definition of undue influence, and upon the evidence which we will presently discuss a verdict was rendered against the validity of the will.

The most important question raised in the sixth exception and upon the whole record is that which is directed to the refusal of the defendant's third prayer denying the legal sufficiency of the evidence upon the issue of undue influence. It is charged that the defendant, by the exertion of such influence upon the testator, induced him to discriminate against two of his sons, the caveators, by the abatement of their shares in the manner indicated in the will. There is ample evidence tending to show that this was done at the desire and request of the caveatee. Whether the evidence is legally sufficient to show that the result was produced by the kind of influence which the law condemns as *undue* is the question to be determined .

. The caveatee was dissatisfied with the price of forty dollars per acre at which his father's farms were sold to the caveators in 1901. He complained repeatedly to his brother Warren that he had not paid enough for his farm and that he had thus been given an advantage over the other "heirs." He claimed that each of the latter had received one hundred dollars less than a sale of the property at an adequate price would have ensured. Upon one occasion in 1906 the matter was discussed in the presence of the testator, and the caveatee repeated his complaint in substance as already indicated, to which his father merely replied: "I got my price." There is nothing in the record to show that any further statements were made to the testator on the subject until the day his will was prepared and executed. He had then been ill for some weeks. As there appeared to be a change for the worse, his son Westwood, who had been staying with him, called his brother Benjamin, the caveatee, from his home nearby, and then went for the doctor. At the time of Westwood's departure Benjamin and his sisters Emma and Clara were in their father's room. Mr. Dudderar said he would like to have a private talk with Benjamin. One of the daughters then left the room and the other went out later upon being told to do so by her brother. The door was then closed. Soon afterwards one of the sisters, who had gone to the cellar for potatoes and who was then immediately under her father's room, heard her brother Benjamin say that he was not satisfied with the price the boys paid for the farms. She did not hear any reply. Benjamin was alone with his father about an hour and a half. At the end of that time Westwood returned from summoning the doctor. His brother then told him that his father was about to attend to his business." He further said "in regard to the sale of the farms to the boys he did not want to have any more than the rest, but he wanted his share." The testator made no reply to this except to say that he had "started his business twice," but "never finished it," and that "it was there in the desk."

Benjamin then went for someone to write the will. In reply to a question from Westwood he said he would get Mr. Albert Dudderar for that purpose. He returned later with the scrivener, who, after some casual talk with the testator, proceeded to obtain his instructions. This was done in the presence of Benjamin, Westwood and the two sisters. Warren Dudderar also was in the house, but it is not clear from the evidence whether he was in the room at this particular time. A book of forms had been provided by Benjamin, and from this a caption for the will was copied. The scrivener then said he was ready and first asked Mr. Dudderar whether he wanted his property sold. He replied that he wished everything sold and the estate distributed as cash. According to the testimony of Albert Dudderar the testator then said that he wanted to divide his property among his children; that he had given Warren and Daisy an advantage over the others in the sale of the farms, and for that reason he wanted to equalize them by reducing Warren's share five hundred dollars and Daisy's two hundred and fifty. The testimony of Westwood Dudderar, however, is to the effect that his father, after saying that he wished to make an equal division of his estate among his children, paused for a few minutes, and Benjamin then "rose up over the foot of the bed and looked at" his father, "who spoke out that he wanted five hundred dollars taken off of Warren and two hundred and fifty dollars off of Daisy Dudderar." "Then," said the witness, "they had to find out father's wealth to know whether they could take five hundred off of Warren E. Dudderar." This brought on a discussion as to the value of the various assets of the estate. Mr. Dudderar said he valued his home property at three thousand dollars and his personal effects at about five hundred. His bank deposits and investments on notes were then added, bringing the amount up to six thousand dollars, and the scrivener said this was enough to show that the proposed deductions for the two shares could be made and that it was not necessary to estimate further. After this was arranged the testator said he wanted to give

his daughter Emma two hundred dollars "for the services she had rendered him there at home." He said that he had paid her wages up to 1900 and since then he had not paid her any, but that during this period she had not been working exclusively for him and had earned money from other sources, and he thought two hundred dollars would be ample compensation. Westwood testified that his father "in the course of time had thought about his watch and ordered it willed to his grandson, Westwood A. Dudderar, son of William Westwood. My brother, Benjamin F. Dudderar, ordered it not to be put in," as the watch could be given to the grandson independently of the will, but the bequest was nevertheless inserted. The testator stated that he wanted his son Benjamin to be the executor of the will. He said: "Ben is the oldest; he is entitled to it, and he is capable."

The scrivener having finished his memorandum of the will in accordance with the instruction read it over to the testator, who said: "That is all right." It was then rewritten in a suitable form for execution. While this was being done the caveator, Warren E. Dudderar, came into the room and sat a while by his father's bed. When the final draft was completed the scrivener proposed to read it to the testator, but he said: "No, don't do that; I understand it." The caveatee had previously gone out for two neighbors to attest the will. As they came in he said: "All disinterested parties will leave the room." The members of the family thereupon retired and the witnesses and the scrivener were left all alone with the testator. Mr. Dudderar then raised himself up to a sitting posture, was handed a pen and subscribed his name to the will, after which it was attested in his presence by the witnesses. Upon being asked what should be done with the will Mr. Dudderar said it could either be put in his desk or handed to Benjamin. It was given to the latter and he shortly afterwards took his departure.

The testimony shows that the testator, while reduced in strength by his illness, was at this time in the full possession of his faculties. There can be no doubt also that he fully

understood the contents of the will. These facts are conclusively established by the verdict rendered under the Court's instructions upon the first and third issues. The evidence upon which the caveators mainly rely to prove undue influence is that which tends to show that the caveatee felt aggrieved at the supposed discrimination which occurred in favor of the caveators in connection with the sale of the farms; that he had abundant opportunity to influence his father to make the deductions which the will finally effected in the shares of his brothers; that immediately prior to the preparation of the will this was urged upon the testator's mind, and that when he apparently hesitated to place any qualifications upon an equal division of his estate among his children the caveatee, by rising at the foot of the bed and looking at his father, induced him to dictate the provisions of which the caveators complain. In support of the theory that the caveatee was responsible for this disposition emphasis was also laid upon the fact that sometime after the execution of the will the testator said to one of the witnesses that he had not intended to make any deductions in the shares of Warren and Daisy until the evening the will was prepared. It is pointed out that this statement was in accord with the intention which the testator had previously entertained as shown by he unexecuted will which he had written with his own hand in 1909. As reflecting further upon the caveatee's influence, reference was also made to some evidence showing that after the testator's death the caveatee in a conversation with some of his brothers said that he had "stopped" a sale of the home place to Warren upon which the latter and his father had verbally agreed; but there is no proof as to the circumstances of that transaction.

It is to be observed in this case that, whatever conclusion may be drawn from the evidence as to the degree of influence exerted by the caveatee upon the testator with respect to the will, the motive for his conduct originated in what appears to have been his genuine belief that he and six of his brothers and sisters had sustained a substantial loss in the distribu-

tion of 1901 as the result of undue liberality on the part of
their father to the two sons to whom he had sold his farms.
The sole purpose of the caveatee's representations on this sub-
ject was to bring about what he regarded as an equalization
among all the children in the disposition of his father's estate.
The provisions to that end in the will here in controversy
secured to the caveatee no benefit in excess of that accruing
to his brothers and sisters whose shares were not subject to
deduction. It is to be noted also that the $500 abatement
for which the will provided as to Warren's share was less
than the amount of the advantage which Benjamin claimed
that his brother had received in the purchase of his farm.

If we had merely to decide in this case whether there is
legally sufficient evidence to admit of the inference that the
caveatee *prsuaded* his father to make the abatement in ques-
tion in the shares of the caveators, we could have no hesita-
tion in rendering a decision in the affirmative; but this does
not constitute the test and measure of *undue* influence. This
Court has consistently adhered to the principle that the only
influence which will be held to be undue and to be sufficient
to invalidate a will which it has affected is that which is
urged to such a degree as to amount to force and coercion and
to destroy the testator's free agency. *Saxton* v. *Krumm,* 107
Md. 399; *Kennedy* v. *Dickey,* 100 Md. 162; *Somers* v.
*McCready,* 96 Md. 438; *Hiss* v. *Weik,* 78 Md. 446; *Grove* v.
*Spiker,* 72 Md. 301; *Higgins* v. *Carlton, supra; Layman* v.
*Conrey, supra; Stirling* v. *Stirling,* 64 Md. 151; *Zimmer-
man* v. *Bitner,* 79 Md. 128; *Tyson* v. *Tyson,* 37 Md. 582;
*Davis* v. *Calvert, supra.*

In *Somers* v. *McCready, supra,* it was said: "From what
thus appears to be the rule of law by which we are to be
guided in the inquiry as to the sufficiency of evidence to
support a charge of undue influence in the procuring of a
will it is not sufficient to condemn and avoid the will to find
that there was influence which affected the testator's disposi-
tion of his property; but it must be, to vitiate his act, such
influence as, at the time he was making such disposition,

dominated his will, took away his free agency and prevented the exercise of judgment and choice by him. There may have been advice, suggestion or importunity going to affect his purpose and act in the disposition he chooses to make; yet if he had testamentary capacity and was free and unconstrained in his volition at the time of making his will, the influence that may have inspired it or any of its provisions will not be that influence which the law denounces as undue."

It was declared in *Davis* v. *Calvert, supra,* the leading case on the subject in this State, that "honest and moderate intercession or persuasion, or flattery unaccompanied by *fraud* or *deceit,* and where the testator has not been threatened or put in fear by the flatterer or persuader, or his power or dominion over him," will not be sufficient.

In our judgment the evidence in this case does not meet the requirements as to legal sufficiency so clearly pointed out in the decisions we have cited. There is nothing from which it could be inferred that the caveatee attempted in any way to intimidate or mislead the testator with reference to any of his testamentary dispositions. In the absence of explanatory proof we might have supposed that possibly the demeanor of the witness who testified to the fact may have suggested something of menace in the attitude or manner of the caveatee as he arose at the foot of the bed when his father paused before directing the deductions from the caveators' shares; but the witness stated that he did not say that his brother's conduct was threatening, although he said it looked to him like "influence." When the whole testimony is considered most favorably to the caveators' contention it seems clear to us that it can not be held to lead to any stronger inference from that point of view than that the testator, while not at first disposed to yield to the caveatee's insistence that a discrimination had occurred in the earlier distribution which ought to be corrected in the will, was finally convinced or persuaded that this was the proper course to pursue and that he acted accordingly in the exercise of his judgment and volition.

The cases in which the evidence was found by this Court to be legally sufficient to show undue influence presented conditions widely different from those here disclosed. In *Hiss* v. *Weik, supra,* for example, the testamentary act was grossly unnatural. It "absolutely cut off an insane son upon whom a motherless and helpless child was dependent and gave to an invalid daughter a mere pittance out of a large and valuable estate." There was evidence that the caveatee who secured all the estate had "cruelly denounced her insane brother to their aged father, shortly before the will was made, as lazy, indolent and unworthy of sympathy," had declared that she had great influence with her father and that "he would do anything she asked him to do," and that in reply to her importunities for money he had been heard to say: "My God, Annie, if you don't let me alone you will set me crazy." The will was contrary to his declarations that he intended to leave his property to his children. There was also evidence indicating that a recital in the will upon which one of its provisions was based had no foundation in fact, thus suggesting the inference that the will did not represent the intelligent and voluntary judgment of the testator.

In *Grove* v. *Spiker, supra,* the caveatee, a stranger in blood, obtained complete dominion over a "feeble-minded, inexperienced and secluded old woman" by "alternately winning her confidence and exciting her fears." There was testimony to the effect that this dominion was so complete that he could "have induced her to sign any will he wanted." The will executed under this influence made no provision for the next of kin of the testatrix and left the bulk of the estate to the caveatee.

It is apparent that the case now under consideration does not approach in its facts the conditions which were held to justify in the cases last cited a submission of the issue of undue influence to the jury.

We approve of all the rulings of the learned Court below except those which resulted in the rejection of the defend-

ant's third and sixth prayers.   As we are unable to concur in the latter rulings they will be reversed and a new trial awarded.

> *Rulings reversed as above specified and*
> *cause remanded.*