## HARRY L. MALONE et al. *vs.* JOSEPH D. MALONE et al., Executors.

### *Wills—Undue Influence—Fraud.*

While under certain circumstances the prior declarations of a testator may become controlling, a change of intention on his part is not *per se* an indication of undue influence, when there is nothing to show that the change of mind was due to improper constraint.　　　　　　　　　pp. 206, 207

Mere conjecture, or a suspicious circumstance, or even an influence or constraint, if not directly connected with the will in the sense of being its controlling cause, will not be sufficient.　　　　　　　　　p. 208

On a caveat to a will on the ground of undue influence, a witness for caveators should not be allowed to testify as to the contents of a paper, said to be in the possession of one of the caveatees, without any notice having been given to produce it, or any statement made accounting for its absence, and nothing to show the relevancy of the testimony.　　　　　　　　　pp. 208, 209

On an issue of undue influence, that one of the caveatees had been guilty of a fraudulent act as regards testator is inadmissible, if such act was unknown to testator, since a man cannot be coerced by an act of which he is ignorant, and which is wholly inoperative as regards producing a constraint upon the free exercise of his will or influencing his bounty in the testamentary paper.　　　　　　　　　p. 209

*Decided April 17th, 1925.*

Appeal from the Baltimore City Court (HEUISLER, J.).

Caveat proceeding by Harry L. Malone and Mary E. Cornell as regards an alleged will of James J. Malone, deceased, to which Joseph D. Malone and John D. Schaefer, executors named in said paper, appeared as defendants. From rulings in favor of the caveatees, the caveators appeal. Affirmed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Robert F. Leach, Jr.*, with whom were *Curran & Leach* on the brief, for the appellants.

*Vernon Cook*, with whom was *Joseph L. McAllister* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

James J. Malone died testate on January 7th, 1923, possessed of personal property, which he disposed of to the disappointment and disapproval of his next of kin, and two of them, Harry L. Malone, a nephew, and Mary E. Cornell, a niece, filed a caveat. The issues were, (1) the factum of the will; (2) mental capacity; (3) knowledge and understanding of the contents of the will; and (4) undue influence. At the trial of the case before a jury in the Baltimore City Court the due execution of the will was established, and the caveators abandoned all the issues, except that of undue influence. When the caveators had concluded their case, the court granted instructions to the effect that on all the issues the verdict of the jury must be in favor of the caveatees. An appeal has been taken by the caveators, which brings up the propriety of the court's ruling on the prayers that there was no legally sufficient evidence in the case from which the jury could find that the will had been procured by undue influence; and on its exclusion of certain offers of evidence by the caveators. The action on the proffers of testimony forms the first eight exceptions, and the ninth exception arises on the prayers.

We approach the questions on this appeal with the admission that the testator, having both the requisite mental capacity and a complete knowledge and understanding of its contents, duly executed a paper writing, which must have full effect as his will, unless there can be found on this record legally sufficient evidence from which a jury might have concluded that the will had been procured by undue influence.

James J. Malone, the testator, had been first a stevedore, and afterwards a ship surveyor. He amassed a moderate fortune, but continued to work at his occupation until October, 1922, when he stopped because of ill health. He was a bachelor, and lived in Baltimore, where his house was kept by Bridget Malone, an unmarried woman of but little mentality, whom the will declared a cousin, but who, according to the testimony, was not a relative, nor were her two brothers, John Malone and Joseph Malone, nor her nephew, John Schafer, nor her niece, Mary L. Schafer. Bridget Malone, however, had been his housekeeper for a great many years, and his household consisted of the testator, the housekeeper, and her brother John Malone, who had come to live with the testator the last few years of his life, and who had been on terms of intimacy. The housekeeper's other brother, Joseph Malone, had boarded with the testator, visited him, and was a friend. Mary L. Schafer, in later years, came to the house occasionally to assist her aunt in cleaning.

James J. Malone, while friendly with his next of kin, Harry L. Malone and John S. Malone, his nephews, and Mary Cornell, Theresa Sharp and Helen Lewis, his three nieces, was not so closely associated with them as with the family of his housekeeper. In fact, Harry L. Malone was the only one who did not appear almost wholly indifferent to his uncle.

When James J. Malone quit work he was ill with consumption, and a few weeks later he was taken in his own automobile to the State Sanitarium at Sabillasville by John W. Mosely, who drove, and John W. Schafer and Joseph Malone. He remained almost a month, but was brought back on December 16th, 1922, by John W. Mosely, who again acted as driver, and Bridget Malone and her brother, John Malone.

James J. Malone was quite weak on his arrival home, and spent his days reclining in a Morris chair until his death, on January 7th, 1923. During this last sickness John W. Mosely was his attendant from seven o'clock in the morning

until half-past six in the afternoon to the end of the day before the testator's death. Mosely left when John Malone returned. Mosely would dress and undress the sick man, who was quite weak, so that he needed assistance to go up and down the stairs; and every other day would take him to the doctor's office to have his throat treated. He was absent the day of the death because of a sprained ankle. It is plain from the testimony that James J. Malone was in the last stages of throat consumption, with its attendant weakness and loss of voice, but there is not a particle of proof that his mental powers were in the least impaired.

On Sunday, December 31st, the witness Mosely testified that Malone was so sick that the doctor was sent for, and when the doctor went out he told the witness that if Malone had anything to settle up he had better do it. Malone inquired the next day what the doctor had said, and the witness informed him, and Malone's reply was that he was not going to make a will.

He did make a will, which was drawn by Joseph L. McAllister, his attorney, and attested by him and Francis J. McGee. After providing for the payment of his debts and funeral expenses, and the sale of his Ford sedan, the testator gave four hundred and fifty dollars towards the building fund of the convent in his parish and to his pastor; and to his next of kin he made a bequest of twenty-five dollars each to his nephew, John Malone, and to his nieces, Mary Cornell, Theresa Sharp and Helen Lewis; and of five hundred dollars to his nephew, Harry L. Malone, who stood closer to the testator than the others. He gave four hundred dollars to Mary L. Schafer, who was friendly with him and whom Mosely saw helping Bridget Malone to clean house while he was there. The residue of his estate he divided among Bridget Malone and her brothers; that is, to her brother, John W. Malone, who lived with him and was his close friend, he gave the sum of seven hundred dollars, and a leasehold property on Andre Street on condition that he pay therefor one thousand dollars; to Joseph D. Malone he left

his diamond ring and the sum of five hundred dollars; and
to Bridget D. Malone he bequeathed his household furniture
and his watch, and all his other real and personal property.
The executors named were Joseph D. Malone and John W.
Schafer, Jr. The testator had an account in his own name
with the National Marine Bank, and the amount to his
credit at death was $1,039.69. The inventory of assets filed
with the Orphans' Court of Baltimore City amounted to
$1,882.40, making the total something over $2,900.00.

The provisions of the will were natural and reasonable in
view of the situation of the testator, and his relation with
the various objects of his bounty. The varying degrees of
intimacy between himself and his nieces and nephews were
accurately reflected by the discrimination he made among
them in their legacies. And this was true, in turn, when he
determined the nature and amount of the gifts to his house-
keeper and her relatives, who were his most intimate com-
panions. The same sensible weighing of their relative
claims was exhibited in the contrast afforded by the bequests
to them in the will. During his life the testator recognized
that it was his duty to provide for Bridget Malone, who was
unable to make a living, and the terms of his will are in
harmony with this conception of his obligation to her.

The testator opened an account in the joint names of him-
self and Bridget Malone, payable to the survivor, with the
Savings Bank of Baltimore on September 29th, 1920; with
the Acme Building Association on January 3rd, 1922, and
with the Baltimore Trust Company on October 6th, 1922;
and the respective deposits in the first two accounts on the
death of the testator were $700.45 and $3,424.75. The
amount on deposit in the Baltimore Trust Company was
$6,324.49 on January 1st, 1923, and on January 4th a
further deposit of $7,414.05 was made.

We find nothing strange or unusual in the provisions of
the will. It is a sensible paper when considered in the light
of its benefactions and the circumstances in which the tes-
tator lived. Nor was it executed in a way to invite condem-

nation. It was prepared from information given to his attorney on Saturday, January 6th, and when the will was taken to the home late Saturday afternoon Malone was lying down. The attorney, Joseph L. McAllister, Esq., did not disturb Malone, but said that he would return on Sunday, January 7th.

On Sunday morning Mr. McAllister took the will to Malone's home. He found Malone, who was dressed, downstairs, in the large front room, in the Morris chair, with Joseph Malone. Francis J. McGee was a friend of the testator and came to see the sick man. He had no knowledge that a will was to be made, and his becoming a witness was accidental. The attorney sat down by Malone and told him that he would like to go over the contents of the will to see if it was what the testator had told the writer on Saturday. The attorney asked McGee if he would act as a witness and listen while the will was read. The attorney, in the presence of McGee, then read the will, paragraph by paragraph, to the testator, who said it was just what he wanted, and that it was perfectly satisfactory. No one but the attorney, McGee, and the testator took any part in the conversation. The will was then signed by the testator, and witnessed. Afterwards, the testator rose from his chair and walked alone a part of the way to the stairs, when he was assisted to his room above, where he died during the course of the day.

While it is true that the testator was weakened by the ravages of consumption, his mind was unimpaired, and he had complete knowledge of the terms of the will at the time he executed it in the presence of the two disinterested parties, his attorney and a friend, who was used as a witness while paying a casual visit. In addition, the attorney testified that it was drawn in accordance with the instructions the testator "had told witness on the day previous." Nothing could be plainer than that there is no evidence here of any undue influence, but that the will was the free and unconstrained act of the signer. Nor can any legally sufficient

evidence of undue influence be discovered anywhere on this record.

The testimony, however slight and inconclusive, has all been carefully weighed and considered in the aspect most favorable to the caveators. No useful purpose will be served by its recital in detail, but some reference may be made to what is most relied upon by the caveators in order that its inconsequential nature may be seen. For instance, the testimony that Bridget Malone slammed the door in the face of two of the nephews within a month before his death is convincing of her attitude, but this was her attitude in the preceding summer, when there is no suggestion that a will was under consideration, and when the uncle was at work. Apart from Harry L. Malone, the uncle saw his other nephews and nieces infrequently, and at long intervals. The three nieces made no attempt to see him after he became sick, except Mrs. Cornell, who went once at night, knocked, and, getting no response, left. John S. Malone, who was so indifferent to his uncle's condition that he did not cross the street to speak to him when he was brought back from the State Sanitarium, did call after Christmas, and Harry L. Malone also made an effort to see his uncle on December 8th. Whatever may have been the ulterior design of Bridget Malone—and that rests entirely on speculation—her exclusion of the two nephews is not shown to have affected in the slightest the testamentary design of James J. Malone. Nor do we think the statements of the witness Mosely that the testator said to him, in reply to his curious and irritating questioning, a few days after the return from the sanitarium, again on the Sunday, and again on the Saturday, before his death, that he was not going to make a will, afford any ground to infer undue influence in the making of the will. Mosely was not a member of the family and he was not entitled to ask the questions, which might well have been regarded as an impertinent inquiry. Under certain circumstances the prior declarations of a testator may become controlling, but we do not conceive that a change of intention

is *per se* an indication of undue influence when there is nothing to show that the change of mind was due to improper constraint.

Mosely was with the sick man during the day, from his return from the State Sanitarium until the afternoon of the day before his death, and he is the sole reliance of the caveators. He had the fullest opportunity to see and hear, yet he could not give an instance of actual force used, none of threats and intimidations, none of persuasion, none of appeal, none of fraud employed, in consequence of which the testamentary paper was induced, none of influence exerted, overpowering and mastering the testator's volition and substituting for his free agency the will of another while in the apparent exercise of his own. The most that Mosely is able to produce is that on the Friday before the execution of the will the attorney, Mr. McAllister, and Joseph Malone, were with the testator, who was reclining in his chair, and that Mosely heard Joseph Malone name some amounts and a ring while Mr. McAllister wrote, and that Mosely went out, and when he came back James J. Malone beckoned for Mosely to take him upstairs to bed, and that there the invalid said, "These people are setting me crazy"; and that when he came down Mr. McAllister remarked: "If I had stayed out a little longer he would have had everything fixed." Mosely supplemented this with the testimony that on Saturday morning Mr. McAllister came there and asked how Malone was, but did not want to see him, and requested that if Joe Malone came down, "Tell him to get out of Jimmy Malone whatever he can, and bring it to his office." Joseph Malone did come down that Saturday and received this message from Mosely.

Mosely's own testimony was that Malone's voice was so faint that he had to put down his ear to catch what he said, and it is quite probable that Joe Malone was repeating to Mr. McAllister what the sick man was saying. If any significance is to be given to the petulant and natural remark of Malone when facing the tedious questions of a lawyer, it

must be that, instead of being subject to the domination of Joe Malone, his action furnished proof that he could cast off and resist pressure and act independently for himself whenever the occasion required. There is not the slightest proof that any of the beneficiaries under the will, or that any one else, ever suggested a single bequest; and whether such suggestions were made, the draftsman of the will carefully read the will to Malone, paragraph by paragraph, to make certain it was in complete accord with his intentions. The whole matter was left to his decision, without prompting, solicitation or urging, and the will was not signed and executed until the answer came that it was precisely as the maker desired. This Court has had this question of undue influence frequently under consideration, and it is useless to repeat the requirements of proof to carry the question to the jury, but mere conjecture, or a suspicious circumstance, or even an influence or constraint, if not directly connected with the will in the sense of being its procuring cause, will not be sufficient. The will of a competent person cannot be nullified on the ground of undue influence without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator. *Kennedy v. Dickey,* 100 Md. 152, 164; *Kelley v. Stanton,* 141 Md. 380, 390, 392; *White v. Bramble,* 124 Md. 400; *Saxton v. Krumm,* 107 Md. 404; *Berry v. Safe Deposit Co.,* 96 Md. 55, 56; *Dudderar v. Dudderar,* 116 Md. 605, 614, 620.

We find no reversible error in the rulings on the evidence. The first and seventh exceptions are to the exclusion of the testimony by Mosely that on Thursday before the death of Malone, John W. Schafer, one of the executors named in the will, displayed to Mosely a paper containing the names of all the Malones, except that of John S. Malone, a nephew, and what they were going to get, and that the Malones mentioned in the will and the amounts of their bequests, with the single exception of John S. Malone, were identical with what was on the paper. The attempt was made to have the

witness speak of the contents of a writing, which was said to have been in the possession of one of the caveatees, without any notice having been given to produce it or any statement having been made accounting for its absence. In addition, there was nothing before the court to make the testimony relevant. Who wrote the contents, what were the circumstances of its writing, and how it came into the possession of Schafer, or what part, if any, it played in bending the will of James J. Malone, was not even indicated. The assertion that a conspiracy exists does not dispense with the necessity for particular offers of testimony to be both relevant and material.

The second, third, fourth, fifth and sixth exceptions relate to the rejection of the offer to prove by Mosley that on Wednesday or Thursday before his death, James J. Malone gave a roll of money, containing the purchase price ($7,000) of some property bought by the Baltimore and Ohio Railroad Company, to Joseph Malone to deposit in the National Marine Bank, but instead Joseph Malone deposited it in the Baltimore Trust Company. At the time the money was delivered Joseph Malone had the three bank books, and the theory of the caveators was that the deposit in the trust company, where the account was a joint one of James J. Malone and Bridget Malone, and not in the National Marine Bank, where the account was in the name of James J. Malone, was a fraudulent act. The caveators had put in evidence everything desired, but where the money was actually deposited, and this appears from the later testimony of the manager of the branch of the Baltimore Trust Company, showing a deposit on January 4th, 1923, of $7,414.05. If this deposit were a deliberate fraud, it was undiscovered by James J. Malone, and, therefore, it could have had no effect upon him whatsoever. A man cannot be coerced by an act of which he is ignorant and which is wholly inoperative so far as either producing any constraint upon the free exercise of his will or influencing his bounty in the testamentary paper. *Smith v. Diggs,* 128 Md. 394; 130 Md. 103.

The testimony offered under the eighth exception was properly excluded, as, if admissible, it should have been introduced in chief. It was purely cumulative. In our opinion there is no reversible error on this record.

*Rulings affirmed.*