ANNE W. DRURY *v.* JAMES K. KING, ET AL.

[No. 10, April Term, 1943.]

*Decided June 1, 1943.*

The cause was submitted to SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*Love & Bailey, Harry L. Kaplan* and *F. DeSales Mudd* submitted on brief for the appellant.

No appearance and no brief filed for the appellees.

SLOAN, C. J., delivered the opinion of the Court.

This case comes here on an appeal by the caveatee from the affirmative answer of a jury to an issue of undue influence in the execution of a will. There were four exceptions to the rulings on the evidence. The first issue was the execution of the will, which it was stipulated was executed by the testator and was in proper form and properly attested; and the answer was, therefore, "Yes." As to the second issue, mental capacity, which was not disputed, the court directed the answer, "Yes." The fourth, fraud; an answer, "No," was directed. On the third issue, undue influence, the caveatee, by her third prayer, asked a directed answer, "No," which was rejected; and from an answer, "Yes," by the jury, the caveatee appeals. The question then is the legal suf-

ficiency of the evidence to support the charge of undue influence.

After the answer of the jury, the caveatee made a motion N. O. V. for an answer in her favor, which was denied by the decision of two judges against it, and one for it; three judges having sat in the case.

The will in question was executed by Dr. Joseph D. King, of Ridge in St. Mary's County, December 18, 1939, whereby he devised and bequeathed to his wife, Henrietta F. King, "one-third undivided interest" in his estate "according to law." To each of his six children, he left five dollars, "it being my intention that they shall receive that sum each and no more." All the rest and residue of his estate he gave to his "good friend," Anne W. Drury, caveatee and appellant. The widow and all of the children filed petitions for caveats in the Orphans' Court of St. Mary's County, which issues, which were agreed upon, were sent to the Circuit Court for St. Mary's County; whence, on the suggestion of the caveatee, they were removed to Charles County, where they were tried, with the results stated.

This is a strange case, without a parallel in the will cases which have come to this court. The testator was a country physician. He and his wife, Henrietta F. King, were married in April, 1899, and lived together until in January, 1939. Seven children were born to them, six of whom are living and named in the will.

There is little or nothing in the record to show why he left. Mrs. King said, "That they lived very well and very pleasantly together up to the last year or two before he died. (That means up to the time of the separation.) That they had seven children; that she did not know the reason for Dr. King's leaving unless it was outside influence." In December, 1938, he contracted pneumonia, which developed into tuberculosis, from which he died October 31, 1940. Shortly after leaving home, he went to the Mount Wilson Sanatorium, where he remained until May, 1939. On leaving Mount Wilson, he maintained a small room and office in a building about a quarter

mile from his home, at the home of Mrs. James Somers, where Mr. Drury, husband of the appellant, also lived. Mrs. King said Mrs. Drury was not living with him there; "he was keeping store down there; at least he was clerking in the store." Dr. King remained there until September, 1939, when he returned to Mount Wilson, where he stayed about two weeks. Shortly after his return, he went to the Leonardtown Hospital for a few weeks, then to Sabillasville; how long he stayed there, does not appear. On his return, according to Mrs. King, he went to the home of Mrs. Drury, located at St. Inigoes, about three miles from Ridge, remaining until he was taken to the hospital, then to Sabillasville in August or September, 1940, and was there until he died on October 31, 1940.

Mrs. King said the Doctor "came home every two or three weeks, at which times he talked about business," and she tried to get him to come back to stay, "as it was not necessary for him to go away in the first place." According to her, he was not providing for her, and she had to borrow money to run the house. He said he had no money. "I cannot give you any; we will have to economize, because this man Drury is going to sue me; they are going to get everything from me; I won't have a shirt on my back." Later, in February, 1940, he sold some property for $5,000, of which she got $2,000. She said she refused to sign the deed unless she did get it.

No one can tell from this record why Dr. King so abruptly left home. Of course, none of us know the true conditions in the others' homes. What we do know is that this woman, with whom he had lived forty years and who bore him seven children, was left what he had to leave her "according to law." The children, to whom a parent owes everything, were cut off, but why? The answer, if there is any, must be found in this record; otherwise, the will, unnatural as it is, must stand. But the court cannot for this reason set aside the will and write another for the testator "without unsettling the

fixed principles of law." *Saxton v. Krumm,* 107 Md. 393, 400, 68 A. 1056, 1059.

A daughter, Frances King Trimmer, a trained nurse, who had resided at West Falls Church, Virginia, since 1926, and who was married February 12, 1938, is the one of the children who seems to have kept in close touch with her father after he left the family home in 1939; she visited him frequently from that time and was present at Sabillasville when he died. She went to see her father several times after he went to Mrs. Drury's. On one occasion, while he was there, she had been asked about a certain statement Mrs. Drury had made, but on objections and motions to strike, the questions and answers were stricken out. We do not know why, but they were, and cannot be considered.

She was asked, however, without objection: "Q. Mrs. Trimmer, during the time that this statement was made, can you recall what led up to that statement, or what, if any, circumstances existed, as far as your father and Theodore Drury were concerned? What had you been discussing that led to that? A. She had some papers there that were—that her husband was trying to sue my father—she tried to make me read those papers, about suing my father, I told her I was not interested in the papers; it did not concern me." She said the letters she received from her father until the summer of 1939, "were very friendly, affectionate, like they had always been." "There was a definite change the fall that he went to Mrs. Drury's to stay; * * * some of them would be very sarcastic, and ask me not to come there to see him, and he would see me at the funeral parlor, and things to that effect; he did not want to see me any more; whereas before, the letters had been very affectionate and kind." "He was always unfriendly from the first time I visited him there (at Mrs. Drury's)," though formerly their relations had been friendly. After he was on his final visit to Sabillasville, Mrs. Trimmer saw him three times, the day he died, and ten and twenty days before. It was quite a distance from where she lived

in Virginia to the sanatorium. On the day her father died, Mrs. Trimmer arrived at Sabillasville about 2.30 in the morning, "and about eight or nine o'clock that morning, the morning of his death. Mrs. Drury was there, and she went out to get her breakfast or something; she came back about eleven. * * * He was lying there very quiet." "He was lying there very quiet, apparently asleep. She came in, very tense, and in a loud voice she said, she kept screaming and saying, 'did she, did they make you sign anything, did they make you sign anything?' He was more or less dumbfounded; I mean he seemed like he was frightened or something. She said, 'I told you she was going to be here.' She said, she called me some name, I could not make out what it was at the time."

Asked, "Q. When you arrived there, was your father very ill? A. Yes, he was perfectly conscious until the minute he died, because the superintendent of nurses called me to talk to me, she called me to come out in the hall, and said it was the request of Mrs. Drury that I stay out of the room. (That is the way it is in the record.) Q. Did you notice that he was in a very weakened condition when you went there? A. Yes, he was. He was just hardly whispering; he was so weak he could hardly whisper; he kept on repeating that he was dying. And every time I could put my hand under the covers, he would reach for it and hold my hand very tightly; but if Mrs. Drury was there, there was no recognition at all, as if I was not even in the room." "When Mrs. Drury came in the room, he would take his hand away, and he would not even state the fact that he was dying, he would not say anything at all." At 1.30 in the afternoon, just eleven hours after Mrs. Trimmer arrived at Sabillasville, he died.

A son, James Kerns King, testified that he saw his father twice at Mrs. Drury's in the presence of two or more sisters, and on the occasion of his last visit in the presence of Dr. Peck and a brother-in-law of the witness, Mr. Ridgell. Saw Mrs. Drury both times. On the

last visit, "probably in the late fall of 1939, his father asked, 'why I did not say hello to Mrs. Drury on my previous visit' to which the witness replied he had not come to see Mrs. Drury but to visit his father, and it was not his intention to be sociable with her, whereupon his father stated the witness need not come to see him if that was the way he felt about it." He saw him again at 2.30 o'clock at Sabillasville the morning of the day the father died, and found Mrs. Drury in the room at the time. This witness is the only one who testified as to his father's property, which he said consisted of three tracts of land and the house where the children were born, but gave no estimate of value.

A daughter, Mrs. Henrietta F. Long, saw her father three times after he left his home in January, 1939. Prior to that, he came to her home every couple of months, and usually spent the day. She saw him first after Easter, 1939, and after his first visit to the Mount Wilson Sanatorium. She next saw him in 1940, at her home when he was in the neighborhood on professional business. At that time, she told him that a tenant was complaining that the buildings needed repairs, to which he replied he was in no condition to bother with such things, and he appeared to be very much upset, "in fact he was almost a wreck; that his property was tied up in such a way he could do nothing about it; he said that Mrs. Annie Drury had his property tied up in such a way he was helpless, and that he would die in the poor house." (He didn't seem to know that he could do what Mrs. Drury feared the day of his death, revoke his will.) She said that after the separation, January, 1939, she noticed a change in his attitude towards her, "he was cool, and did not seem as interested as he might have been."

Mrs. Beatrice Fenwick, who had known the testator since 1933 and whose family physician he was, testified that in the summer of 1940, he visited at her home, on which occasion he seemed very much depressed, and said, "I am no better in health; mentally, I am a wreck," asked

what seemed to be his trouble, he said, "Well, you would not understand, because I have done some things that I regret. It is too late now, but it won't make any difference." Crying, he said, "No one can help me now. If I could undo some things that I have already done, or if I could call back some time. * * * He said he had signed some paper that if he could call back the time, he would not sign. He said you will know later what it is all about." She did not know what he referred to, but she had heard of the sale of the property and at the time thought he must have meant that. She said nothing and likely did not know of a will, and it is more likely that is what was on his mind. It all went to the jury without objection, who drew their own conclusion, and the result shows they did.

This was all of the evidence tending to show that the testator was unduly influenced to make the will here contested.

The only evidence offered by the caveatee was that of the Reverend Nelson Maconomy, an Episcopal minister at Trinity Church in St. Mary's County. He said that while Dr. King was boarding at Mrs. Drury's, in 1939, after he returned from the Wilson Sanatorium and vacated his office at the home of Mrs. James Somers, which must have been the office he took on leaving home, Dr. King spoke to the witness "several times in regard to a will that he was writing or having written rather; and the will was composed and written in Leonardtown," and he was shown and read it. He was asked by Dr. King to take it to Mr. John F. Mudd, at La Plata, to have him "check it up," to see if there were any "legal loopholes." He told the Rev. Maconomy what he wanted to do with his property. The will agreed with what he had told him he wanted. This all shows that he was making no secret of his intentions, and he wanted to be sure of their expression.

We have related at some length, but the case requires it, all of the evidence offered having any bearing on the issue.

It has long been held by this court that the undue influence need not be exerted at the time of the execution of the will, but that it must be effective at the time of execution. *Davis v. Calvert,* 5 Gill & J. 269, 25 Am. Dec. 282; *Moore v. McDonald,* 68 Md. 321, 12 A. 117; *Thomas v. Cortland,* 121 Md. 670, 89 A. 414. In some cases the opinions used the term "operative." *White v. Snyder,* 124 Md. 395, 92 A. 763; *Dudderar v. Dudderar,* 116 Md. 605, 613, 82 A. 453.

There is no evidence in this case, if there was undue influence exerted, resulting in the execution of the will, it has to be inferred from the circumstances. There is no time disclosed by the record at which Dr. King was so dominated by Mrs. Drury as to subject his will to hers, to such an extent that the will does not express his wishes with respect to the disposition of his estate, and that but for the influence exerted by her, it would not have been made.

The only fact in the record showing any connection of Mrs. Drury with the execution of the will is the record of the probate of the will, in which her affidavit when she offered the will for probate says that "she received the same from the testator on or about the 18th day of December, 1939." The will is dated December 18, 1939, so that it evidently was delivered to her promptly upon its execution.

We have no evidence as to where the will was executed or who were present, except the attesting witnesses, or whether Mrs. Drury was within sight or hearing. Of course, as stated, it is not necessary to prove the testator was unduly influenced at the time of the execution of the will, but the testimony of those present is not unimportant. But in this case, there was a stipulation that the will was duly executed, and none of the witnesses took the stand and testified. It demonstrates the fact that a stipulation sometimes may conceal facts more important than it discloses.

There is no evidence in the record that Mrs. Drury had anything to do with Dr. King's desertion of his

family. Mrs. King said she did not know, "unless it was outside influence." Dr. King did not go directly to Mrs. Drury's, but the home of Mrs. Somers, and it was some months later that he went to live at the home of Mrs. Drury. The will must have expressed his purpose and intention. He had it written by a lawyer in St. Mary's County and had the Rev. Maconomy take it to another in Charles County "to have a further check up to see if there were any legal loop-holes."

In Bishop Ames Case, *Hiss v. Weik*, 78 Md. 439, 28 A. 400, it was declared that the provisions of a will may be so grossly unjust as to require little direct evidence to conclude that it was the product of undue influence, and cites *Grove v. Spiker*, 72 Md. 300, 20 A. 144. A comparison of the facts in those cases will show that they can hardly be held up as precedents in this.

There is no evidence that Dr. King was not of sound and disposing mind; the undisputed evidence is that he was, and the court so instructed the jury. He had tuberculosis and was slowly dying ever since he had left his home, but "the law looks only to the competency of the understanding, and neither age nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a will if sufficient intelligence remain." *Higgins v. Carlton*, 48 Md. 115, 144, 92 Am. Dec. 666; *Birchett v. Smith*, 150 Md. 369, 376, 133 A. 117; *Berry Will Case*, 93 Md. 560, 584, 49 A. 401; *Cronin v. Kimble*, 156 Md. 489, 496, 144 A. 698.

The testator had a right to disinherit his children, if he chose, but he could not deprive his wife of her lawful share of his estate. He had the advice of competent lawyers as to how far he could go in the disposition of his estate to a stranger, with a concessum that the testator was mentally competent, we do not find that the facts in evidence as to undue influence amount to any more than suspicions that Mrs. Drury had subjugated his will to hers. As said in *Malone v. Malone*, 148 Md. 200, 208, 129 A. 10, 13, "mere conjecture, or a suspicious circumstance, or even an influence or con-

straint, if not directly connected with the will in the sense of being its procuring cause, will not be sufficient. The will of a competent person cannot be nullified on the ground of undue influence, without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator." *Berry v. Safe Deposit & Trust Co.*, 96 Md. 45, 55, 56, 53 A. 720; *Saxton v. Krumm*, 107 Md. 393, 404, 68 A. 1056; *Dudderar v. Dudderar*, 116 Md. 605, 614, 82 A. 453; *White v. Bramble*, 124 Md. 395, 400, 92 A. 763; *Kelley v. Stanton*, 141 Md. 380, 390, 118 A. 863; *Zimmerman v. Hull*, 155 Md. 230, 236, 141 A. 531; *Birchett v. Smith*, 150 Md. 369, 379, 133 A. 117; *McCoy v. Fluharty*, 162 Md. 617, 623, 161 A. 657.

The conclusion which we have reached does not require a consideration of the first four exceptions, which were to rulings on the evidence favorable to the appellees. The ruling refusing the prayer for a directed verdict on the third, undue influence, issue will be reversed and the case remanded for a new trial.

*Ruling reversed and case remanded.*