Grove *vs.* Spiker.

(Decided 18th June, 1890.)

---

JOHN S. GROVE *vs.,* ELIZABETH SPIKER, and others.
ELIZABETH SPIKER *vs.* JOHN S. GROVE, and others.

*Will— Undue influence.*

Undue influence is that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act.

The charge of undue influence in the procurement of a will, was established in this case.

APPEALS from the Orphans' Court of Alleghany County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, IRVING, BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

*J. Semmes Devecmon,* and *Ferdinand Williams,* for John S. Grove.

*Benjamin A. Richmond,* for Elizabeth Spiker.

Grove *vs.* Spiker.

McSHERRY, J., delivered the opinion of the Court.

These are appeals from the Orphans' Court of Alleghany County. A paper-writing, purporting to be the last will and testament of Margaret Steyer, was propounded for probate on the twenty-seventh day of August, 1889, and on the same day a caveat was filed by a sister of the decedent. The caveat alleges that Miss Steyer was of unsound mind, incapable of making a valid deed or contract, when the paper was executed ; that she did not know or understand its contents, and that the alleged will was procured by the undue influence of one John S. Grove. Grove, the sole caveatee, answered under oath, and a mass of testimony was taken. The Orphans' Court admitted all of the paper to probate except the residuary clause, and that it rejected. From the order so passed, both caveator and caveatee have appealed.

A careful examination of the record has convinced us that Margaret Steyer, though a woman of weak and feeble intellect, was still possessed of sufficient mental capacity to make a valid deed or contract. As a recital of the evidence bearing on this branch of the case cannot possibly serve any useful purpose, we pass, without further comment, to a consideration of the other questions raised by the caveat.

Undue influence is that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act. It is closely allied to actual fraud ; and like the latter, when resorted to by an adroit and crafty person, its presence often becomes exceedingly difficult to detect. Indeed, the more skilful and cunning the accused, and the more helpless and secluded the victim, the less plainly defined are the badges which usually denote it. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be looked for, the

situation of the party taking benefits under the will towards the one who has executed it, and their antecedent relations to each other, together with all the surrounding circumstances, and the inferences legitimately deducible from them, furnish, in the absence of direct evidence, and often in the teeth of positive testimony to the contrary, ample ground for concluding that fraud or undue influence has been resorted to and successfully employed.    The circumstances to which we shall allude in a moment have forced upon us the conclusion that the alleged will of Margaret Steyer was the direct result of an undue influence, adroitly, cautiously, and secretly exerted by the caveatee, John S. Grove.

Margaret Steyer died August the twenty-third, 1889. She was then a spinster between eighty-seven and eighty-eight years of age.    She had lived a very secluded and retired life, and was never seen away from the premises occupied by her in the town of Frostburg.    She was illiterate, unable to read manuscript, or to write her name.    In addition to this, she was a woman of feeble mind and easily influenced, particularly by any one who had gained her confidence.    Many years ago she intrusted the management of her property, which then consisted of some real estate, and about seven thousand dollars of money and securities, to a Mr. Knode, and, upon his becoming too old to attend to the business any longer, she selected a Mr. Metzger.    These gentlemen collected her rents and interest, made deposits thereof in bank to her credit, and every month drew by check the sum of fifty dollars and gave that amount to her for her support.    Her next of kin consisted of a sister, and the children of two deceased brothers and one deceased sister.    None of these relations resided with her.    She visited no one, and seems to have been visited by but very few persons.

Grove, the caveatee, is an educated man, forty-five years of age, and a lawyer by profession.    He was a total

Grove *vs.* Spiker.

stranger to Miss Steyer when he went to Frostburg, and was not related to her in any way. His habits were dissipated, and his conduct at times exceedingly disorderly and lawless. He moved to Frostburg some seventeen years ago, and shortly afterwards rented an office, which was located on the same lot occupied by the house in which Miss Steyer lived. In a short time his wife separated from him, and not long thereafter he went to live in the house of Miss Steyer, paying neither rent for the office, which belonged to her, nor board for his meals and lodging in her home. He fastened himself upon her, and soon began to procure small sums of money from her, and by rude and offensive conduct endeavored to deter her sister-in-law, Mrs. George Steyer, from visiting her. He gradually, by alternately winning her confidence and by exciting her fears, obtained complete dominion over this feeble-minded, inexperienced, and secluded old woman. That dominion was so complete that he could, as stated by some of the witnesses, have induced her to sign any will he wanted. He continued an inmate of her house until she died.

As the evidence depicts her, she was an easy subject for fraud or undue influence to prey upon. As it portrays him, he was mentally far superior to her, and he was morally capable of resorting, without scruple, to either of those devices to procure her property. His opportunities to do this were most ample and unrestricted.

On March 23rd, 1885, he obtained from her a deed for the office property he occupied. He paid no consideration for the property, and withheld the deed from record until April 13th, 1886. She signed the deed, we are told by some of the witnesses, without knowing what it contained, because Grove told her to sign it ; and her business agent, Mr. Knode, was kept by Grove in total ignorance of this transaction for some considerable time.

In 1883, Miss Steyer, after consulting her agent, Mr. Knode, made a will, by which she gave all of her estate, real and personal, except five small legacies, amounting to twelve hundred dollars, and a portion of her furniture, to her nephews and nieces and her sister-in-law. This will was fully explained to her, and was duly executed and attested in the presence of her agent. Mr. Knode and Mr. Wingert were made executors. The whole residuum of her estate was given to the children of her deceased brother, Absalom. The five pecuniary legacies were as follows : To Margaret S. Grove, a daughter of the caveatee, $200 ; to Mrs. Jarrett, $400 ; to Mrs. Frost, $200 ; to Sarah Dorsey, colored, $300, and to the Lutheran Church, $100. On November 12th, 1885, Grove wrote a codicil to this will, and had it executed. He did not consult her agent, and did not apprise him of the fact that a codicil had been made. By this codicil a legacy of $1000, given by the will to her sister-in-law, was reduced to $250, and the remaining $750 were given to Grove ; the legacy of $400 to Mrs. Jarrett was reduced to $200, and the other $200 were given to Hannah Humberston, who was then living with Miss Steyer ; the legacy of $200 to Mrs. Frost was revoked and the same amount was given to Flora Humberston, also an inmate of her house, and finally Grove was named a co-executor. In exactly sixty days thereafter, viz., on January 12th, 1886, the will now in controversy was executed. It was written by Grove without consultation with Miss Steyer's business agent, who knew nothing of it until after her death, and the results of Grove's influence are evident in every disposition made by it. Not a single next of kin of this feeble-minded woman was given a dollar under it. By the first clause Grove was given a legacy of $1000 ; by the second Hannah Humberston, who lived in the house, and would have taken nothing had there been no will, was given $500 ; her sister, Flora Humberston,

similarly situated, was given $300 ; Grove's daughter was given $300, and the colored woman, Rachel Dorsey, $300. All the residue was given to Grove, and he was appointed sole executor. Her real estate (other than the office property conveyed to Grove) had been previously conveyed, under the advice of her agent, Knode, to the persons to whom it had been devised by the will of 1883 —she retaining a life estate in herself. Thus, in sixty days after the codicil was made this new will was procured, completely and radically changing the disposition of nearly her entire personal estate. The children of her deceased-brother, Absalom, would have taken the residuum under the will of 1883, which in this particular was unchanged by the codicil of 1885. But in sixty days after the date of the codicil, without the intervention of any reason or cause whatever which did not exist when the codicil was made, the bulk of her estate was diverted from her kindred and turned over to Grove, a stranger in blood. Her whole personal estate amounted to about seven thousand dollars, and of that five thousand and nine hundred dollars were absorbed by Grove for himself and his daughter, and the remaining eleven hundred dollars went to the two female domestics and a colored woman. It was, perhaps, in his estimation, necessary that the interests of these domestics should be identical with his own. With the inmates of the house hostile to him, or antagonistic, he might have found himself without a shred of testimony to support the will. He doubtless assumed that the chances of procuring evidence against him from within the household would be greatly lessened by making the interests of the occupants coincide with his own.

The extent of his dominion over her is unmistakable, when the results accomplished by it are examined. Under the will of 1883 his daughter received a small legacy. Under the codicil of 1885 he appeared as a legatee

and co-executor, and in two months afterwards a new will, written by him, gave him nearly six-sevenths of her whole estate and made him sole executor. He had boasted to Mr. Metzger before the will was made that he would "be all right when Aunt Peggy died;" and the will now before us was undoubtedly designed to bring about that result.

He selected none of the persons best acquainted with her to witness the will, and precisely the same witnesses were called on to attest the codicil of 1885 and the will of 1886. He knew that she attempted to transact no business whatever without consulting her agent; that she never made her mark to a check without that agent's knowledge and approval, even when the money was expended to pay Grove's debts; and he further knew that she was fully and completely under his dominion. The record discloses but two instances besides the codicil of 1885 and the will of 1886, where she appended her mark to any paper without the advice of her agent, and these were when Grove procured the deed conveying the office lot to himself, and when he induced her to become security on his promissory note for $100. He must have known that Knode would have objected to her signing a will cutting off her nearest kindred, and devoting nearly all her property to a dissipated stranger, and hence he purposely refrained from calling him in, and kept him in ignorance of its existence until her death made it impossible to revoke it. With the dominion he possessed over her, and the opportunities he had to exert it; with his moral senses warped enough to use that dominion unduly for his own aggrandizement, a will under which he seeks to absorb nearly her whole estate cannot be other than the product of an undue influence which Courts of justice should promptly reprobate and condemn.

We have not overlooked the evidence adduced by the caveatee, and have given to it the weight to which it is

entitled. The opinions expressed by the disinterested witnesses were no doubt honestly entertained by them ; but they are at most but mere opinions, and cannot overcome the inculpatory facts we have alluded to, and the conclusions which plainly follow from them.

As the view we have taken is decisive of the case, the other question presented need not be considered.

That part of the order appealed from which refused probate of the residuary clause will be affirmed with costs, and the rest of the order will be reversed with costs, and the case will be remanded that the Orphans' Court may pass an order refusing to admit any part of the paper of January 12th, 1886, to probate.

> *Order affirmed in part, and*
> *reversed in part, and*
> *case remanded.*

(Decided 18th June, 1890.)