EDWARD D. McCOY, Executor, et al. *v.* LAVINA
M. FLUHARTY.

[No. 7, April Term, 1932.]

*Decided June 20th, 1932.*

618

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, and SLOAN, JJ.

*F. Leonard Wailes* and *J. Owen Knotts,* with whom were *Wailes & Robins* on the brief, for the appellants.

*Thomas W. Simmons* and *W. Brewster Deen,* with whom were *William J. Rickards, James L. Benjamin,* and *Miles & Bailey* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The caveatees, now appellants, defending an attack upon the validity of a will, appeal from rulings of the circuit court in a proceeding upon issues of fact sent from the orphans' court. The jury sworn to try the issues found that the will had been procured by the exercise of undue influence and fraud, and the ruling now principally contested is one that evidence legally sufficient to support the finding was produced.

Louis M. Carr, of Dorchester County, executed on April 28th, 1928, a will in which he devised and bequeathed the residue of his estate, after payment of his debts, and funeral and administration expenses, to an organization known as the Board of Church Extension and Home Missions of the Church of God, of Anderson, Indiana. Edward D. McCoy was appointed executor, with a request that he employ Mr. A. Stengle Marine as counsel, and there was expressed a

desire and request that indulgence for a reasonable time be extended to McCoy for repayment of an indebtedness due on a contract of sale, and of money advanced for him and at his request. The testator died in June of 1929, and the will was duly probated on June 11th, 1929. On February 6th, 1931, a petition and caveat were filed by the appellee, a niece of the decedent, resident in the State of Pennsylvania. All of the six objections usually advanced in support of caveats were advanced in this instance, but at the trial one was abandoned by agreement of counsel; on three, including those on the mental capacity of the decedent, the court directed verdicts or answers in favor of the will because there was no legally sufficient evidence to support contrary findings; and the jury were left to render verdicts on only the two issues relating to procurement of the will by undue influence and fraud upon the testator. The executor himself was the person charged with having exercised the undue influence and fraud, and he, with the documents in his possession, was the chief witness relied upon to prove the charge. His answer to direct questions was that he had not exerted any undue influence upon the testator, and that the testator was a man who could not be so influenced; and therefore proof that the undue influence was nevertheless exerted, and did procure the will, is to be sought in circumstances testified to. Suspicion, if not proof, arises mainly from efforts made by McCoy to secure from the beneficiaries what he describes as recompense for care of the testator, or benefits which the testator intended him to have under an amended will which the testator was not able to make.

The testator was a man beyond eighty years of age at the time of the transactions narrated in the evidence, and is described in the caveator's evidence as a vigorous man, with weakening in the last year or two of his life, but with a strong will, and inclined to obstinacy, although open to persuasion. He was religious, and mention is made of another church or church causes or organizations to which he expressed some thought of giving his estate, as an alternative to the gift to the beneficiary named in the will. He seems to

have had no relatives in the neighborhood in which he lived. He visited his niece in Pennsylvania two or three times a year in years past, and sent her greeting cards and small gifts at times. He had not seen her since February of 1927. He lived during the last three years of his life mostly with McCoy and his wife, they giving him the care he needed. The relations in the household appear from the testimony to have been amicable, although the disciplined housekeeping of Mrs. McCoy was annoying to him at times. The testator left an estate of between $20,000 and $30,000.

In August of 1925, two years before the execution of the will, the testator and McCoy had attended a camp meeting held by the Church Extension, under the direction of a Mr. Monk, and heard Monk outline to the congregation some needs for money for the organization's work, and make an appeal to all for aid, and, at the conclusion of the meeting, Carr, according to McCoy, expressed a belief that the cause was one to which he might well contribute. McCoy communicated this to Monk, and Monk sought out Carr, but failed to obtain from him a loan of $2,000, as he had hoped. McCoy, learning from Monk of his failure, undertook to aid him, and shortly after, Monk was given by Carr a loan of $2,500, on what is termed a lifetime note or bond, the promise in which was to repay the amount ninety days after demand by Carr himself, in his lifetime. McCoy testified that his part in that transaction was only to remind Carr that he had been giving his money out in loans on which repayment was doubtful, and the loan now sought, in contrast, would be one to responsible borrowers. Carr, he states, concluded, at first, to make the loan of $2,000, but finding that his bank balance was larger than he had supposed, he volunteered to add $500. Some requirements insisted on by Carr were met by Monk by execution of the bond in Indiana, upon telegraphic instruction from Monk. There was at the time talk between Carr and Monk about Carr's giving Monk's organization a power of attorney which would put in the hands of the organization control of Carr's estate after his death. The power was executed two months later, and was one with little

restraint placed upon the authority given. No use seems to have been made of it during Carr's lifetime, however, and none after his death, of course, because it was not then operative as intended.

McCoy, before the power had been executed, but, as he testifies, supposing that it had been executed at the time, began efforts to obtain assurance from the beneficiary of some payment to himself for care of Carr. He asked at first $10,-000, thinking then that the estate would amount to $30,000 or $40,000, and Monk, in reply to a letter, not produced in evidence, telegraphed McCoy on November 1st, 1926, that the latter "would be protected in the matter mentioned." The power was executed on November 26th, 1926. Early in the year 1928, it appears, McCoy was informed by lawyers among his relatives in New York, to whom he explained these transactions, that the power of attorney would not be effectual after Carr's death. McCoy repeated this to Carr, and Carr cited an instance in which, as he thought, such a power of attorney had been effectual. But on that same day the will now attacked was executed. McCoy went with Carr to Mr. Marine's office, and after some debate on the effectiveness of a power of attorney, the will was prepared and executed. McCoy says that he did nothing to influence the making of the will, except that when the testator was undecided whether to leave his estate to the Holiness Church, or Foreign Missions, or give it to Mr. Riggol, of the organization ultimately made the legatee, McCoy reminded Carr that he (Carr) had always been a member of the church here, and added something like, "I believe if I were you I would stick to them." Carr's talk about the church's getting his money was voluntary with Carr, and what McCoy said did not make much difference to him anyhow. "Whatever he wanted to do you could not change him; you might as well try to change the wind."

McCoy received no benefit under the will prepared and executed, except such as might result from the request of the testator that a reasonable time be given for payment of the debts to the testator, and, in the latter part of the year

1928, he took up with Monk, for the legatee, the question of securing him in some compensation for care of the testator. Monk replied that McCoy ought to be protected and would lose nothing by what he was doing. In the early part of the succeeding year, 1929, the year of the testator's death, a number of communications passed between McCoy and the legatee organization and officers. McCoy wrote on February 8th, 1929, saying that Carr had now been with him three years and had become a great care, expressed dissatisfaction, and desire of his family and himself for compensation from the legatee, and threatened to put the testator from his house unless definite arrangements should be made. "You have already got," he wrote, "twenty-five hundred dollars of his money that you would not have got if it had not been for me and the will would not stand in your favor if it had not been for me and he asked me several times of late to call for the twenty-five hundred, but I did not do it. And he wanted to change his will to Holiness Church and I talked him out of it. And if he leaves my place I am sure it will all be changed." A contract securing him $10,000 was suggested, and it was asked that the discussion and any arrangements made be kept confidential. The legatee answered, expressing a desire to do the right thing, but an inability to act without knowing the amount of the estate. During the correspondence, Carr, with McCoy, went to Mr. Marine's office to change the will, but Mr. Marine declined to prepare a new will because of the testator's mental condition then. That was on April 25th, 1929, and the testator died six weeks later, on June 6th, 1929.

After the death, and probate of the will, McCoy continued his efforts, and a form of contract between him and the legatee was prepared in July of 1929, but was never executed by the legatee. The object stated was to secure McCoy in benefits which he would have received if the will had been changed. Then McCoy hunted up the niece, wrote her and with Mr. Marine visited her at her home, and suggested her attacking the will, and making an agreement which would secure to McCoy and Mr. Marine parts of the estate which

they said had been promised them by the testator. At that time the niece declined to act.

This we believe to be a fair summary of the facts which would find support in the evidence. And the question is whether they together afford ground for a finding that the testator, competent to make a will as he pleased, was when he made this will under the dominance of another, so that he did not express his free will and judgment. As is argued on behalf of the appellants, this court has many times pointed out that the will of a person possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. *Kennedy v. Dickey,* 100 Md. 152, 164, 59 A. 661; *Birchett v. Smith,* 150 Md. 369, 379, 133 A. 117. "Mere conjecture, or a suspicious circumstance, or even an influence or constraint, if not directly connected with the will in the sense of being its procuring cause, will not be sufficient. The will of a competent person cannot be nullified on the ground of undue influence, without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator." *Malone v. Malone,* 148 Md. 200, 208, 129 A. 10, 13. "If we had merely to decide in this case whether there is legally sufficient evidence to admit of the inference that the caveatee persuaded his father to make the abatement in question in the shares of the caveators, we could have no hesitation in rendering a decision in the affirmative; but this does not constitute the test and measure of undue influence. This court has consistently adhered to the principle that the only influence which will be held to be undue and to be sufficient to invalidate a will which it has affected is that which is urged to such a degree as to amount to force and coercion and to destroy the testator's free agency." *Dudderar v. Dudderar,* 116 Md. 605, 619, 82 A. 453, 458.

From the evidence here rehearsed a strong suspicion may well arise that McCoy had a greater part in procuring this will than he states. The generosity to the religious organization upon McCoy's persuasion, the broad power of attorney

given, the following of the will promptly upon McCoy's discovering that the power of attorney would be inoperative after Carr's death, McCoy's statements and threats of procuring action by Carr, and the plan for a new will, all lend force to a supposition that McCoy was in 1928 working upon the testator in the interest of the organization to procure Carr's estate for it in some way, and that his aid was effective. But evidently McCoy had arranged for no advantage to himself if the organization did get the estate. The will gave him nothing. It did not even relieve him of the payment of his debts to the estate. And McCoy had to struggle with one possible beneficiary after the other to secure for himself the advantage he sought. From the fact of his resort to the beneficiaries, even while Carr was living, it would appear rather that he could not influence the testator to give him what he so earnestly sought. And, to repeat, the testimony to the facts recited as ground for suspicion was accompanied by statements and explanations by the same witness for the caveator, that there was not in fact any undue influence exercised, and none could have been effective upon this testator. Upon consideration of all these circumstances, this court comes to the conclusion that there is not sufficient evidence to support an adjudication that Carr's will was in fact produced by undue influence, amounting to coercion, exercised upon him. The evidence supports no more than a suspicion. Two prayers of the defendant for direction of a verdict to this effect were therefore, in the opinion of this court, improperly refused. And this being true, there is no need of passing on other rulings excepted to.

*Rulings reversed, and case remanded.*

---

Offutt, J., filed a dissenting opinion as follows:

The facts conceded by the demurrer prayers in this case on the issue of undue influence may be thus stated: Louis M. Carr, aged about eighty-four years, partially paralyzed, feeble, and failing mentally and physically, on April 28th,

1929, executed what purported to be his last will and testament, under which he gave his entire estate to the Board of Church Extension and Home Missions of the Church of God, of Anderson, Indiana, hereinafter referred to as the Anderson Church. At that time he was living with one Edward D. McCoy at McCoy's home in Federalsburg, Caroline County, Maryland. McCoy, who was probably his closest friend, had first met him some thirty-four or thirty-five years ago, when he came to Caroline County from Pennsylvania and lived at Carr's home for about a year. After that McCoy, who was in the lumber business, lived for some years in Pennsylvania, then in Federalsburg, then for a time in North Carolina, and then again in Federalsburg. Carr was twice married. His first wife died twelve or fourteen years ago, and he and his second wife separated. After that separation he began to stay with McCoy at first occasionally, and then more or less continuously. He had no children and his nearest relatives were nieces and nephews, and with at least one of them, Lavinia M. Fluharty, he was on friendly, even affectionate, terms, and on more than one occasion announced an intention of leaving his property to her.

In the last two years of his life indications of mental and physical degeneration became apparent, he dragged one foot, he became very feeble, in 1927 he had a "spell," evidently a stroke of paralysis, and after that on occasions he failed to recognize friends of many years' standing, his conversation at times was disconnected, he was careless in his personal habits, and, after he moved to McCoy's house, McCoy, over his protest, "would wash and clean him up" and tell him that he had to change his clothes, which he did not do very often. All that was contrary to his former habits, for McCoy testified that: "Well, ten years before Mr. Carr died he was a man that attended to and took care of his own business, he did not ask anybody to do for him. He kept all his business to himself. After I took him or after he asked me to take him, he seemed to shift his responsibility on me and have me do the things he used to do himself, and I kind of felt like it was possibly due to his dangerous heart trouble he had. I

took him to Doctor Frazier and he said he had heart trouble. When I said those things I also said, right on top of that, that Mr. Carr could sit right down and hold a conversation with anybody. He had a good mind and was well read and he could talk politics, scripture, and pick and find fault with as many people as I ever saw."

He appears to have had the utmost faith and confidence in McCoy, and in the later years of his life often consulted him about his affairs, he "kind of" looked to him in a way, and asked his "advice on a good many things."

While the two men stood in that relation to each other, one William E. Monk, an agent of the Anderson Church, attended a "camp meeting" at which Carr and McCoy were present, and learned from McCoy that Carr had some money "and would possibly make a loan." Monk, at a time when McCoy was absent, acting on that information, attempted to have Carr lend $2,000 on a so-called "bond," which was in fact a revocable gift subject to the payment of interest during the life of the donor. He was wholly unsuccessful and was apparently about to leave Federalsburg, when he met McCoy, and told him of his failure. McCoy told him that he was about to go to Cambridge for Carr, and apparently gave him the impression that he might succeed where Monk had failed. He and Monk then went to Cambridge, where he met Carr and at once persuaded him not only to make the loan for $2,000, but to lend $2,500. That was on September 26th, 1926, and on November 1st, 1926, after that demonstration of the possibilities latent in McCoy's influence over Carr, he received this telegram from Monk: "Letter just received. You will be protected in matter mentioned." Following that, on November 26th, 1926, Carr executed to one Herbert M. Riggle, of Oklahoma City, a man whom he had not apparently ever met or seen, a power of attorney, under which he gave Riggle for no stated purpose the complete control of his entire estate, including the right to sign his checks. The obvious purpose of that instrument was to get Carr's estate into the hands of the Anderson Church, but McCoy eventually discovered that the death of Carr

would terminate the power, and that his estate would vest in his heirs and representatives. Upon that discovery there was a further conference between Monk and McCoy. Referring to that conference, McCoy gave this testimony:

"Mr. McCoy, did you not tell Mr. Monk at that time this old man was worth about thirty thousand dollars and that you could get him to make a will leaving all of his property to the Board of Extension Society of Anderson, Indiana, or words to that effect? A. I said thirty-five or forty thousand dollars. I don't think I used those words, but this is what I remember, that I believe that I could get him to make his estate to the Church Extension. I believe I made that statement. Q. Did not Mr. Monk at that time say to you, if you did do that he would see that you got ten thousand dollars provided the estate amounted to as much as thirty thousand dollars, or words to that effect A. He did not say that in those words. Q. What words did he say it in? A. If you will allow me I will tell you what he did say. The question was up about the keeping of Mr. Carr and as to whether I was going to get paid for it, and Mr. Monk says to me, well, it is worth a good deal to take a man like that in your home and care for him and especially if he isn't anything to you, and he says if his estate is what you say it is, thirty-five or forty thousand dollars, and says you are not provided for in the will, he says if I have any say I should say that you should have ten thousand dollars out of an estate like that."

McCoy, called by the caveator, did not admit that he had procured the power of attorney; but his subsequent conduct, his admissions, and the telegram leave no other reasonable inference. It did not appear that he had had any other dealings with Monk, or that there was any reason why he should look to Monk for protection except in eventually securing some part of Carr's estate. He said in his testimony that the protection referred to in the telegram related to Carr's failure to provide for him (McCoy) in his will, but as the will was not made until a year and a half later, that statement was

obviously error and he must have referred to the power of attorney.

It may at least be rationally inferred from these facts that McCoy, the intimate friend of Carr, had learned that he possessed an estate of some value, and that he conveyed that information to Monk, with the design that that estate could be secured for Monk's church in such a way that McCoy could receive a considerable part of it, without the risk incident to such a transaction if it were given directly to him. The problem was how to do that. When he learned that the power of attorney would not accomplish his ends, McCoy at once began again to work on Carr with a view of having him make a will leaving all his property to the Anderson Church, after he had received from Monk what he appears to have regarded as satisfactory assurances that he (McCoy) would receive a substantial part of the estate. On August 25th, 1928, he received a soothing and reassuring letter from Monk in which, among other things, the writer said: "Was glad to hear from you yesterday. Certainly appreciate your interest in the cause of God, and I believe you will lose nothing by what you are doing."

As time went on, however, and McCoy received no more definite assurances, satisfaction gave place to doubt and suspicion, and on February 8th, 1929, he wrote this letter to the Anderson Church Board:

"Church Extension Board,

"Anderson, Ind.,

"Dear Sir:

"A few lines in regard to Mr. Carr of Federalsburg who has made his home with me for 3 years. He has become a great care and has willed his entire estate to the Church and has made no provisions for me pays no board I care for him like a mother would an infant and my family is disssatisfied unless the Church Extension makes some provisions for me. You have already got twenty five hundred dollars of his money that you would not of got if it had not bin for me and the will would not stand in your favor if it had not

bin for me and he ask me several times of late to call
for the twenty five Hundred but I did not do it. And
he wanted to change his will to the Holiness Church
and I talked him out of it. And if he leaves my place
I am sure it will be changed. My family and nabors
who onely knows what we have to put up with are not
willing to go any further unless some definet arrange-
ments are made between me and the Church Extension
Board. no man knows just what the man is worth. I
know more about his business than any other man and
I don't no. Some people think 40 thousand some more,
some less. I think probly 30 thousand will be nearer.
However to take care of him and continue as I and
family are doing not knowing how long this will last I
want ten thousand of his estate. And if the Church
Extension Board will consent to this and sign an
agreement I will suffer it out. if not he will haft to
leave my place. No one is doing anything for him
but me and wife. If you wish you can take the mat-
ter up with Bro J. W. Hallowell and J. C. Fisher who
are concidered Just men in the Church at this place.
And if the Extencion Board does this or not I wish this
matter to be kept confidencial unless you wish to take
the matter up with Bro. Halowell and Bro J. C. Fisher.
Mr. Carrs Attorney ast me do do this and he will pre-
pair a contract if it is satisfactory. Trust this will all
be kept between the Church Extencion Board and Bro
Hallowell and Fisher and myself.

"Very Truly Yours,        E. D. McCoy."

Far from being shocked at McCoy's letter of February
8th, 1929, the board spoke of sending an agent to investigate,
and on March 13th, 1929, wrote McCoy a letter in which it
was stated:

"Replying to your letter of Feb. 8th, I am glad to
consider with you the proposition of careing for Bro.
Carr.

"I am somewhat at a loss to know what should be
done to reimburse you for taking care of Bro. Carr.
It seems to me it would be impossible for us to at

present sign a contract with you guaranteeing you $10,000 of the estate because we have no proof that the estate is any larger than that. What I mean is Bro. Carr has invested only a small amount with this Board and we have never been notified that any will has been made bequeathing any property to this Board.

"We, of course, want to see fair play and I would not think it right at all for you to be deprived of re- numeration for your work of careing for Bro. Carr. As to binding ourselves though for a certain amount like this, I hesitate until we could look further into the matter."

McCoy on May 1st, 1929, again wrote the board a letter in which he said:

"I received a letter a few weeks ago in answer to a letter I writtin to you concerning Lewis M. Carrs Estate. So I understood by your letter you did not intend to protect me, which Mr. W. E. Monk when He was Here agreed to do. and Also writtin me three letters and sent me a telegram and assured my protection if I Had his—Mr. Carrs Estate made over to the Extension board and I Hold his letter and telegram. You wouldn't take my word nor the leading business men in the Federalsburg Congregation but said in your letter you would Have Mr. Rowe come an investigate the mater. So you dident do that. I was the only man as Mr. Monk will tell you that put this money and Estate in your Hands and I worked Hard to accomplish my end. by your letter to me you Have already lost two thousand five Hundred Dollars which has bin taken up which I could of held for you. Now then if I get no protection I will take hands off and you will loose his intire Estate which will amount to 25 or 30 thousand dollars and if I get no protection in the next 10 days my Hands is off and then I never expect to do no more for that work. And I am writing Mr. Monk and Expect Him to Meet me in Anderson and go before the Board."

To that letter the board answered on May 8th:

"Replying to your letter of May 1st. I must say that I think you misunderstood my other letter because it is not the intention of the Board here to withhold from you anything that should rightfully come to you, because of what you are doing for Bro. Carr.

"What I meant to explain in that letter was that we did not know anything about how the estate was being handled nor the amount of it and therefore we are in no position to pledge any certain amount until we had some information.

"We do not know what Bro. Monk promised you when he was there. He did not tell us of making any promises but I am writing to him now and trying to find out about this matter.

"We have certainly appreciated anything you have done about this work and I would not wish you to think that we are ungrateful. We have not paid the note at the bank yet because I have been waiting for an order from Bro. Carr. The Life Loan note states that the order must be made in person. I have written to him telling him that we are very glad to repay the money whenever he makes the demand.

"I believe that we can handle this matter without any trouble when we get a better understanding. It is almost camp meeting time and if you are coming to camp meeting, I believe it would be a fine think for you to meet Bro. Mond here and then we can all talk the matter over there.

"I assure you that we do not want to take advantage of anyone and we appreciate whatever you have done for the advancement of God's work.

"Yours in Christian service,

"Secretary."

Carr died on June 6th, 1929, and on the 10th of that month McCoy went to Anderson with a copy of the will, and as to that conference he testified: "I took a copy of the will along and read the will or had it read to them and the secretary of the board says, 'you are not mentioned in the will.' I

says, 'no, I am not mentioned in the will, I know that,' but I says, 'I understood that Mr. Monk said if I wasn't mentioned in the will that I would be protected just the same and would be paid for my care and keeping of Mr. Carr.' After we talked the matters over they asked me to withdraw and I went out. Now I says that ten thousand dollars I wrote for in that letter, I don't want that, I says, I wrote that but I don't want that, I only want what Mr. Carr wanted me to have. I said he wanted me to have a half interest in the water front farm and the obligations between us canceled and I said, you carry out his wishes and I am satisfied, and Mr. Monk and Mr. Miller came back to Federalsburg."

After that conference McCoy returned to Federalsburg, and later, in the presence of Monk, an agreement was prepared between the board of the one part, and McCoy and A. Stengle Marine of the other, in which, among other things, it was recited:

"The said Louis M. Carr after the execution of his last Will declared, suggested and said that in consideration of kindness, friendship and services rendered, he wanted and offered to make such change of his Will that all indebtedness and obligations of every kind due him by the said Edward D. McCoy be cancelled, and that the farm situated on the Little Choptank River, in Dorchester County, known as the 'Dixon Place' go to the said Edward D. McCoy and A. Stengle Marine, and

"Whereas, Reverend William E. Monk, representing the said Board of Church Extension and Home Missions of the Church of God, of Anderson, Indiana, was informed of this gift and bequest to said Board and later informed of the intention and declaration of the said Louis M. Carr to change his Will, and

"Whereas, the said Board of Church Extension and Home Missions of the Church of God, of Anderson, Indiana, through its representative, Reverend William E. Monk, advised the said Edward D. McCoy that if the said Will remained and no change was made therein, the said Board would agree to a distribution of the

estate in keeping with the proposed change and desire of the said Testator, and,

"Whereas, the said Edward D. McCoy and A Stengle Marine accepted and relied upon the statement and representation of the said Reverend William E. Monk at the time the said Louis M. Carr suggested making the change in said Will, to the end that the said parties of the second part would receive the gifts and bequests as herein above set forth."

About two months after Mr. Carr's death, and after the Anderson Church Board had failed to execute that agreement, McCoy and Marine visited Miss Fluharty and informed her of her uncle's death, of which she had not at that time heard, showed her a copy of the will, and tried to persuade her to attack it. To quote Miss Fluharty: "After that Mr. McCoy said, Mr. Carr always wanted him to have $4,000 and Mr. Marine said he also promised me $4,000. I said, 'Well, why did he not make it in black and white then,' and Mr. McCoy said, 'Well, that is what we tried to get him to do, I tried to get him to go down to Mr. Marine's office to make a new will in our favor, I hired a machine and took him down in a closed machine, as he wasn't able to walk, and when I got him down there his mind went blank and said where there was a stone wall or a brick wall he thought there was a window, and Mr. Marine said it was too late to make a new will.' I asked them how much they thought he was worth and they said somewhere in the neighborhood of ten thousand dollars."

That evidence, in my opinion, was sufficient to compel the conclusion that McCoy, the executor, and Monk, agent of the Anderson Church Board, the appellants, entered into a cold-blooded and deliberate bargain under which McCoy was to induce Carr, who had the utmost confidence in McCoy's friendship and good faith, and who relied upon him not only for such physical attention as he needed, but also for advice and assistance in the management of his affairs and the disposition of his estate, to make a will leaving his property to Monk's principal, which was to compensate McCoy from it,

ostensibly for his attention to Mr. Carr, but it may also be inferred more for his services in procuring the will. It may also be inferred that McCoy exercised an influence over Carr which he found it difficult, if not impossible, in his mental and physical condition, to resist. McCoy himself said that after Carr came to live with him, "instead of" caring for his own business and taking care of collecting his rent and renting his houses," he would ask for McCoy's advice.

But there could be no more striking demonstration of that influence than was afforded by his purchase of the so-called bond for $2,500 and his execution of the power of attorney. He bought the bond at McCoy's suggestion, after he had definitely refused to do so at the request of the agent of the church to which he left his whole estate. He executed the power of attorney to a man whom apparently he did not know, and by it placed all of his property in the uncontrolled power of a stranger. The idea of making the will which he executed does not appear to have occurred to him at all until McCoy suggested it, and he was willing to change it at McCoy's request, for he went with McCoy to his lawyer's office for that purpose; but the change was not made, because "his mind was blank" and the lawyer thought that it was too late. Finally, some two years before his death, he announced that he intended to leave to his niece the property which under his will he gave to the Anderson Church Board.

To say that the facts recited do not afford legally sufficient evidence that the will was procured by undue influence, to my mind, is to admit an aloofness from the walks and ways of men and their ways which prevents such an understanding of their acts and their motives as is needed to deal satisfactorily with their affairs. On a mere issue of fact I should not ordinarily feel at liberty to dissent from the conclusion reached by the able and experienced judges who speak for the court in this case. But this, it seems to me, is more than that and much more important than that. The effect of the opinion is that a consummated and successful conspiracy between two men to utilize the influence of one of them, who stood in what may well be considered a confidential relation

to a man about eighty-four years old, mentally and physically feeble and partially paralyzed, who looked to him for help and advice, to secure his estate for their own selfish ends, is not evidence legally sufficient to show that the will executed according to their plans was procured by undue influence. Whether it is, is not so much a question of law, as of a correct interpretation of fact. McCoy, the executor, not only admitted but boasted that the will was his will, for he wrote to his cocaveatee that he was the "only man as Mr. Monk will tell you that put this money and estate in your hands and I worked hard to accomplish my end." And strong as his language was, it was amply supported by facts admitted by the prayers. There is not the slightest evidence that, before McCoy and Monk reached a common understanding in reference to Carr's estate, Carr ever contemplated leaving it to the church. On the contrary, the evidence is that he intended to leave it to a niece whom he frequently visited, and so far was he from any intention of giving his whole estate to the Anderson Church that he had even refused to lend it $2,000. It may, for reasons already stated, be inferred that McCoy undertook to have him revoke that decision, and he revoked it; that McCoy undertook to have him execute a power of attorney transferring the control of his property to that church, and he executed it; and that McCoy undertook to have him make a will giving that property to the church and he made it. For McCoy, in his letter of February 8th to the church board, said: "You have already got twenty-five hundred dollars of his money that you would not have got if it had not bin for me and the will would not stand in your favor if it had not bin for me and he ask me several times of late to call for the twenty-five hundred but I did not do it. And he wanted to change his will to the Holiness Church and I talked him out of it. And if he leaves my place I am sure it will be changed." And in a letter of May 1st he wrote: "So I understood by your letter you did not intend to protect me, which Mr. Monk when He was Here agreed to do. and also written me three letters and a telegram" (referring to the power of attorney)

"and assured my protection if I had his—Mr. Carr's Estate made over to the Extension board."

It is said in the majority opinion: "But evidently McCoy had arranged for no advantage to himself if the organization did get the estate." But that conclusion is not, I think, consistent with the evidence, for the positive testimony of McCoy is that he had arranged for a very substantial benefit to himself if the church got the estate, and his only complaint now is that, after it got the benefit of his services, it failed to live up to that agreement. And in its letter of March 13th, 1929, after it had been told that McCoy had not only induced the testator to make the will but he could also induce him to unmake it, the board by plain implication ratified that arrangement in principle, and only refused to guarantee him the amount he named because it did not know the size of the estate.

Upon the whole case I am of the opinion that the demurrer prayers on the issue of undue influence were properly refused by the trial court, and for that reason I am constrained to dissent from the majority opinion.

Adkins, J., also dissents.