SELLERS ET. AL. *v.* QUALLS, EXECUTOR ET AL.

[No. 3, October Term, 1954.]

60.

*Decided December 30, 1954.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Lee Harrison* and *Michael Paul Smith,* with whom were *Eli J. Golden* and *Albert L. Sklar* on the brief, for the appellants.

*H. Richard Smalkin,* with whom were *Smalkin & Hessian* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

The appellants are the *caveators* of the will of the late Cora A. Hinson Dunn, dated March 5th, 1949. The will was offered for probate in the Orphans' Court of Baltimore County; but because of the filing of a notice of *caveat,* followed by the filing of an actual *caveat,* issues as to the validity of the will were framed in customary form and were transmitted to the Circuit Court for Baltimore County for trial before a jury. Only two issues were contested. These were mental capacity and undue influence. The trial court sustained objections to testimony by two of the appellants, each a lay witness,

and by a medical expert, a psychiatrist, with regard to the mental capacity of the testatrix; and at the conclusion of the *caveators'* case, the Court directed a verdict sustaining the validity of the will on each of the issues. This appeal brings up for review the rulings directing verdicts on the issues of mental capacity and undue influence and the exclusions of testimony above referred to.

The *caveators* are three sisters and the brother and the daughter of a deceased sister of the testatrix. Two sisters, Mrs. Cavey and Mrs. Molesworth, did not join in the *caveat*. The *caveatees* are the Reverend Claude R. Qualls, who is the executor named in the will, and the Bethel Pentecostal Church of the Assemblies of God (usually referred to below as the "Bethel Church"), Jones Creek, Maryland, of which Mr. Qualls was and is the pastor. By her will, Mrs. Dunn devised her home property known as No. 7401 Bay Front Road, in the Jones Creek (Sparrows Point) area in Baltimore County, consisting of about 2.9 acres of land improved by a dwelling house, to the Bethel Church; and she devised and bequeathed the residue of her estate to "such persons as the laws of the State of Maryland declare to be my next of kin and heir of law."

The record does not disclose the value of the property devised to the Bethel Church or the value of the residuary estate. Estimates of the value of the home property given during the argument in this Court varied rather widely. It is, however, a waterfront property and would appear to be of greater value than the residuary estate, even including in the latter a number of United States Savings Bonds, which were registered in the name of Mr. George Cavey, a brother-in-law of the testatrix, seemingly with instructions to divide them after Mrs. Dunn's death among her next of kin. (This, too, is not entirely clear from the record.)

Mrs. Dunn's husband died in April, 1947, and shortly after his death, her sister, Mrs. Mamie Sellers, who is now one of the *caveators*, went to live with Mrs. Dunn at the latter's home and helped to take care of her. Mrs.

Dunn had been a large woman, weighing one hundred and eighty-five pounds or more; but as a result of diabetes, from which she suffered for some years prior to her death, her weight went down to about one hundred pounds. Though Mrs. Dunn was supposed to adhere to a strict diet to combat diabetes, she did not do so. She entered St. Joseph's Hospital in December, 1947, largely because of her diabetic condition and left about the end of that month on her own insistence and contra to medical advice.

The chief grounds upon which the appellants found their claim of mental capacity on the part of the testatrix are briefly these: the effects of diseases from which she suffered; her rather frequent falls both indoors and outside, her rummaging through a garbage dump, which she permitted to be established on her place (and on which she sometimes fell), and eating moldy bread and other food which she retrieved from it; once eating food which she had vomited; eating food given her by hucksters for her chickens; eating large quantities of cheese, liverwurst, braunschweiger or bacon, regardless of diet restrictions; licking her plate; making unfounded accusations of theft against a tenant, against her sister, Mrs. Sellers, and against others; hitting Mrs. Sellers with a saucer at some unspecified date in 1950; making unfounded allegations of attempts to poison her; hiding money in odd places; laughing, crying or talking to herself and seeming nervous or upset; and on one occasion wanting to put roomers out of the house and then letting them return almost immediately.

The testatrix' disgusting eating practices were manifested on some occasions, but the evidence is far from clear as to when these occasions occurred or how long these practices were continued, or how frequently they occurred, or as to how bad the salvaged food really was. Much of the salvaged food she fed to her chickens. Her own eating of salvaged food seems to have been a manifestation of an odd and extreme form of miserliness;

but miserliness is not necessarily the hallmark of insanity, and is more likely to indicate the reverse.

Testimony given by Mrs. Sellers as to business transactions, including the execution of a number of deeds or contracts for the sale of land, in which the testatrix engaged, indicates the presence, rather than the absence of mental capacity, and it does not seem to have occurred to Mrs. Sellers at the time when her sister was entering into these transactions that she was incompetent to do so. Mrs. Dunn's desire to avoid the expenditure of money was apparent in these transactions, for she employed the Reverend Mr. Qualls to act as her agent in negotiating them, since he charged her nothing for his services, and she did not wish to incur the expense of employing a lawyer. With a similar desire to minimize expenses she sought to deceive a hospital by wearing clothing retrieved from the dump instead of new articles purchased for her, with her own money, by one of her sisters.

Neither Mrs. Dunn's change of mind about her roomers, nor her occasional hiding of money in odd places seems to indicate anything more than eccentricity.

Her violations of diet restrictions were undoubtedly dangerous to her health, and probably to her life, but they did not impress the trial court, nor do they impress us, as signs of insanity. It is common knowledge that persons do violate diet restrictions at the risk, at least, of impairing their health; and this alone does not indicate a lack of such mental capacity as is required for the execution of a valid will. The question of testamentary capacity has been litigated many times in this State. As was pointed out in *Mecutchen v. Gigous,* 150 Md. 79, 86, 132 A. 425, 429: "In Maryland we customarily take our statements of the law on proof of mental capacity to make a will from the expressions of Chief Judge Buchanan in *Davis v. Calvert,* 5 G. & J. 269. The formulas which run through all our subsequent decisions may be read there, and it seems unnecessary to repeat them here at any length. But it has never been intended to

require under these formulas any extraordinary mental capacity for making a will. *Jones v. Collins,* 94 Md. 403; *Higgins v. Carleton,* 28 Md. 115." See also *Sykes, Contest of Wills in Maryland,* Sec. 61. The statute relating to mental capacity to make a will in force when Mrs. Dunn made her will and when she died (as well as now) is substantially identical with that involved in *Davis v. Calvert.* Code (1939), Article 93, Section 335; Code (1951), Article 93, Section 346; Acts of 1798, Chapter 101, Sub-Chapter 1, Section 3. As stated by *Sykes, op. Cit.,* "Whether a testator had sufficient mental capacity is determined by a consideration of his external acts and appearances. It must appear that at the time of making the will he had a full understanding of the nature of the business in which he was engaged; a recollection of the property of which he intended to dispose and the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of his bounty."

Applying this test to the instant case, we agree with the learned trial judge that there was no suffiicient evidence to warrant a finding of mental incapacity.

Mere eccentricity is not enough. *Jones v. Collins,* 94 Md. 403, 51 A. 398.

Neither are delusions, unless the will is the product thereof, and the burden is on the *caveator* to establish this as a fact. *Harris v. Hipsley,* 122 Md. 418, 89 A. 852. See also *Gesell v. Baugher,* 100 Md. 677, 60 A. 481; *Jones v. Collins,* 94 Md. 403, 51 A. 398. If the testatrix harbored the belief that her sister, Mrs. Sellers, had tried to poison her, it seems clear that no such delusion controlled her in the making of the will, for Mrs. Sellers was a beneficiary under the residuary clause on the same basis as other close relatives as to whom no such suspicion had been expressed. Furthermore, the incident particularly relied upon by the *caveators* to establish such a belief seems to have occurred some time after the making of the will.

On the question of mental capacity, we come now to the exclusion of certain evidence offered by the *caveators*.

The testimony of two lay witnesses on the mental capacity, or lack thereof, of the testatrix was excluded. Each of them was a sister of the testatrix, and each of them happens to be one of the *caveators*. The rule is well established, as stated by *Sykes, op. cit.*, Section 67, that: "A witness who is not an expert, an attending physician, nor a subscribing witness to the will, is not competent to express his opinion as to the capacity of the testator, without first stating facts upon which his opinion may be adequately founded." If such facts are not sufficient to support an opinion of the testator's lack of mental capacity, the witness should not be permitted to express such an opinion. *Doyle v. Rody,* 180 Md. 471, 481, 25 A. 2d 457, 462; *Brashears v. Orme,* 93 Md. 442, 448, 49 A. 620, 622; *Wood v. Hankey,* 133 Md. 389, 397, 105 A. 430, 433. (Compare *Grill v. O'Dell,* 113 Md. 625, 637, 77 A. 984, 990.) All of the facts upon which these two witnesses would have based their opinions are among those enumerated upon which the *caveators* rest their claim of the testatrix' lack of mental capacity. We agree with the learned trial judge that they are not sufficient to warrant the expression of their opinion.

The proffered opinion testimony of Dr. Freedom was properly excluded, we think, on the question of mental capacity on the authority of *Grant v. Curtin,* 194 Md. 363, 384-385, 71 A. 2d 304, 313-314; *Berry v. Safe Deposit & Trust Co.,* 96 Md. 45, 57-59, 53 A. 720, 724-726; and *Horner v. Buckingham,* 103 Md. 556, 64 A. 41. In reaching this conclusion we are not unmindful of the statement in *Grant v. Curtin, supra,* that psychiatry has undoubtedly made great strides since the days of the *Berry* case, but what was said in *Horner v. Buckingham, supra,* at page 563, still is pertinent: "Evidence that the person has a disease which may or must eventuate in mental disease cannot prove, or standing alone tend to prove, that at a given point of time that he is actually so afflicted. The tendency to mental infirmity, cannot

*per se* prove the infirmity, it must be shown by facts. If a person has always shown through many years a high degree of mental soundness, in fact through his entire life, a jury ought not to be permitted to pronounce him insane, merely because a medical expert can be found who will testify that he is affected with a disease, that may eventually produce insanity, without other facts being shown that tend to prove that his speech or conduct is such as reasonably warrant the conclusion that such point has actually been reached." The difficulty in the path of the *caveators* in the instant case, as in *Horner v. Buckingham, supra,* is to show sufficient manifestations of incapacity at the time of making the will to lay the necessary foundation for the admission of the testimony of an expert psychiatrist who admittedly never saw the testatrix.

In concluding the statement of our views on this phase of the case it is hardly necessary to add that neither old age nor debility is necessarily a yardstick of mental capacity. *Cronin v. Kimble,* 156 Md. 489, 144 A. 698. Neither does the fact that a will disappoints reasonable expectations of prospective beneficiaries establish lack of mental capacity. *Watson v. Young Women's Christian Association,* 137 Md. 355, 112 A. 616. In the instant case the meagerness of the record with regard to the relative value of the property devised to the Bethel Church and of that passing under the residuary clause to the next of kin and heirs at law makes it difficult to sustain a claim of mental incapacity based in whole or in part upon any alleged injustice intrinsic in the will, even though intrinsic evidence furnished by the will itself is one of the elements to be considered in determining the sanity of the testator. *Smith v. Shuppner,* 125 Md. 409, 93 A. 514; *Sykes, op. cit.,* Section 64, page 82.

We are of the opinion that the evidence introduced or sought to be introduced on the issue of mental capacity was not sufficient to overcome the presumption of capacity to make a valid will. See *Sykes, op. cit.,* Section

63, and the numerous cases therein cited recognizing the presumption.

On the issue of undue influence there are additional facts shown by the evidence and some of the facts already recited are also pertinent on this issue.

The testatrix was evidently a devoted member of the Bethel Church. She was frequently visited by the Rev. Mr. Qualls after he came to that Church as pastor in 1946. Customarily, he talked with her alone on these visits, and she usually seemed somewhat nervous and upset after his visits. She lent him $2,000 on quite liberal terms, and she entrusted the management of a large part of her business affairs to Mr. Qualls early in 1948. Her will was drawn by an attorney selected by Mr. Qualls, and was actually typewritten at the home of Mr. Qualls just before its execution. On the day before the execution of the will Mr. Qualls had a long and private conversation with the testatrix, which lasted two hours and seemed to upset her. On the day of the execution of the will, the testatrix went to the home of the Qualls. Either Mr. or Mrs. Qualls (there is a dispute as to which) called for Mrs. Dunn and took her over to the Qualls' home. The attorney was already there or arrived shortly afterwards pursuant to an arrangement made by Mr. Qualls. The only other person present in addition to the Qualls, Mrs. Dunn and the attorney was Mr. Martin, a deacon of Mr. Qualls' church. He came at the request of Mr. Qualls shortly before the will was executed and he and the attorney acted as witnesses of the will. After it was executed it was delivered to Mr. Martin and was placed and kept in the safe of the Bethel Church.

Mr. Qualls evidently enjoyed the confidence of the testatrix, and he so testified himself. On the occasion of the $2,000 loan he obtained the money from her bank in accordance with a letter or other authorization from her, and he handled other matters between her and the bank. He assisted her in sales of some pieces of property (as already stated) and he sometimes took her to see a doctor. At one time he briefly had possession of the

savings bonds which the testatrix later turned over to Mr. Cavey. According to his testimony this was merely for the purpose of putting them in the church safe for safekeeping, where they were in the custody of the treasurer. Mr. Qualls described them as "enough to choke a cow." This may have been accounted for by the fact that many of them seem to have been of small denominations.

Undue influence has also been a much litigated question. To warrant a finding that it invalidates a will, it must be shown that there existed "that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act." *Grove v. Spiker,* 72 Md. 300, 301, 20 A. 144; *Sykes, Contest of Wills in Maryland,* Section 91, and cases there cited. It is often stated that undue influence sufficient to invalidate a will must amount to coercion. See, for example, *Stockslager v. Hartle,* 200 Md. 544, 92 A. 2d 363, and *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48.

Though there was evidence, including hospital records, to indicate illnesses from which the testatrix suffered during the period from 1947 to 1951, and though physical infirmity may reduce the ability of a testator or testatrix to resist any attempted undue influence (*Kennedy v. Dickey,* 100 Md. 152, 59 A. 661, *Mecutchen v. Gigous, supra, Griffith v. Benzinger,* 144 Md. 575, 125 A. 512, *Sykes, op. cit.,* Section 91), such direct evidence as there is with regard to the extent of Mr. Qualls' power to control Mrs. Dunn's disposition of her property tends to show that his alleged control was far from complete. The first episode is shown by the testimony of a Mrs. Ellis. She recounted a conversation with Mrs. Dunn, which seems to have taken place in 1948, the substance of which was that Mrs. Dunn asked Mrs. Ellis' advice about a suggestion made by Mr. Qualls (which he later denied having made) for an exchange of his house for hers. Mrs. Ellis replied by asking Mrs. Dunn if she wanted to do so; Mrs. Dunn said that she did not, and the con-

versation concluded by Mrs. Ellis saying to Mrs. Dunn, "Okay, if you don't want to, I wouldn't do it, if I were you." Mrs. Dunn did not do it.

The second episode occurred in 1950 or 1951. Testimony offered by the *caveators* showed that in 1950 or 1951, Mrs. Dunn received a visit from Mr. Qualls and that the next morning she inquired of a boarder, "Do I have to sign away everything to get into the Kingdom of God?" This question may suggest what she and Mr. Qualls had discussed on the preceding day; but it seems to have little weight. Certainly, her will, executed about a year or more earlier (on March 5, 1949), did not give everything to her church, nor did she change it, nor is there any evidence of any transfer of any property by her to the church at that time.

It is true that under the will Mr. Qualls is named as executor and not as a beneficiary, but the church of which he is pastor is apparently the principal beneficiary; and the fact that he himself is not a beneficiary is not controlling if the will was the result of undue influence exercised by him. *Davis v. Calvert,* 5 G. & J. 269, 303. See also *Watson v. Young Women's Christian Association,* 137 Md. 355, 112 A. 616; *McCoy v. Fluharty,* 162 Md. 617, 161 A. 657. In each of these last two cases, the will was held not to be the product of undue influence, but the fact that such influence might invalidate a will in favor of someone other than the person exerting such influence was recognized.

That the testatrix left the bulk of her estate to her church (if, in fact, the property devised to the Bethel Church is the greater part of it) would not, of itself, seem enough to establish the existence of undue influence. *Conrades v. Heller,* 119 Md. 448, 87 A. 28.

The confidential relationship which existed between the testatrix and her pastor is a relevant fact which may be considered along with any other pertinent facts in determining whether there was undue influence in connection with the devise to the Bethel Church. In this State, however, a distinction has been recognized in

the case of gifts *inter vivos* and gifts by will, insofar as the effect of confidential relations is concerned. In *Griffith v. Diffendorffer*, 50 Md. 466, this Court said (at pages 483-484): "But there is an obvious difference between a gift, whereby the donor strips himself of the enjoyment of his property whilst living, and a gift by will, which takes effect only from the death of the testator. And in *Parfitt v. Lawless*, L. R. 2 P. & D. 468, where the testatrix gave all her property to a Catholic priest, her confessor, it was expressly decided, that the doctrine of confidential relations as recognized by courts of equity, in dealing with gifts or contracts *inter vivos*, had no application to gifts under a will. Lord Penzance says: 'In the cases of gifts or other transactions *inter vivos*, it is considered by courts of equity, that the natural influence which such relations as those in question involve, exerted by those who possess it, to obtain a benefit for themselves, is an *undue* influence. The law regarding wills is very different from this. The natural influence of the parent or guardian over the child, or the husband over the wife, or the attorney over the client, may lawfully be exerted to obtain a will or legacy, so long as the testator thoroughly understands what he is doing, and is a free agent.'" See also *Tyson v. Tyson*, 37 Md. 567, and *Koppal v. Soules, supra,* which is the most recent case in which this Court has referred to the doctrine of confidential relations in connection with testamentary cases. After referring to the *Tyson* case, in which it was held that the doctrine did not apply in the case of a bequest from a parent to a child, the opinion added "if, indeed, it has any application to testamentary dispositions." Other authorities were then referred to, which show that in a number of other jurisdictions the doctrine has been held applicable to testamentary gifts. In this State, however, the rule announced in *Griffith v. Diffenderffer* has not been altered by decision or by statute. Under that rule the burden of proof does not shift to the *caveatees* or either of them by reason of the confidential relation which Mr. Qualls bore towards the

testatrix. Even if the rule of *Griffith v. Differderffer* should be reconsidered, the result of this case might not be altered, for the testimony makes it clear that the testatrix was deeply interested in the Bethel Church and that her interest antedated the time when Mr. Qualls became the pastor. Also, the rather odd fact may be noted, that the only *direct* testimony of a suggestion that the testatrix should leave her property to the church is contained in the testimony of Mrs. Ellis, the sister-in-law of the testatrix and the wife of a *caveator*. Mrs. Ellis, after saying that she had never asked Mrs. Dunn whether she had made a will, testified that "When she said that she was going to sell her home and go into the old woman's home, I said, well you say the church has been so good to you, why don't you leave it to them." This conversation occurred in 1951 and obviously could not have suggested or inspired the provision in favor of the Bethel Church contained in Mrs. Dunn's will made in 1949, but it does seem to throw some light on the testatrix' feeling towards her church. Perhaps the case which is most nearly akin to the instant case (in which there was a vigorous dissent) is *McCoy v. Fluharty*, 162 Md. 617, 161 A. 657. In that case one McCoy, with whom the testator lived and who took care of the testator in the later years of his life, was named as executor under the will, but received no other benefit under it, and was instrumental in causing the testator to leave the residue of his estate to a particular church organization. The executor sought to secure compensation from that organization for his care of the testator and some other benefits which he claimed he would have received, if he had not dissuaded the testator from changing his will. It was held that the evidence raised only a suspicion of undue influence, even though, as the majority opinion stated, "From the evidence * * * a strong suspicion may well arise that McCoy had a greater part in procuring this will than he states." The majority held that the evidence supported no more than a suspicion of undue influence

and that the *caveatees'* motions for a directed verdict were improperly overruled.

There was some testimony to the effect that the testatrix had expressed an intention to leave her property to Mrs. Sellers, but a mere change of mind is not enough to show undue influence. *Koppal v. Soules, supra.*

After a careful review of the evidence we have reached the conclusion that although there were circumstances which would give rise to suspicion on the question of undue influence, they were not sufficiently weighty, either separately or taken together, to support more than suspicion that the will was the product of undue influence, and hence that the trial court was correct in its ruling directing a verdict in favor of the *caveatees* on this issue.

*Rulings affirmed.*